**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Kenneth Wayne PARKER,**
**Defendant–Appellant.**

No. 88–1524.

United States Court of Appeals,
Fifth Circuit.

June 29, 1989.

11. *Reaves v. Ole Man River Towing, Inc.,* 761 F.2d at 1112.

Thomas S. Morgan, Midland, Tex. (Court-appointed), for defendant-appellant.

Wayne F. Speck, LeRoy M. Jahn, Michael R. Hardy, Asst. U.S. Attys., Helen S. Eversberg, U.S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before GOLDBERG, JOHNSON, and DUHE, Circuit Judges.

JOHNSON, Circuit Judge:

Appellant Kenneth Wayne Parker appeals his conviction of two counts of conspiracy. We have examined Parker's asserted grounds for reversal, and, finding them unavailing, affirm.

I. *FACTS AND PROCEDURAL HISTORY*

Parker was indicted in January 1988 and charged with conspiracy to abduct Susan Lindsey forcibly and cause her to be transported in foreign commerce for purposes of prostitution (Count One) and conspiracy to abduct June Gilkerson forcibly and cause her to be transported in foreign commerce for purposes of prostitution (Count Two), both in violation of 18 U.S.C. § 1201(c).

At trial, the principal evidence against Parker was supplied by co-conspirator David Alderink. Prior to the alleged offenses, Alderink, a probationer, was assigned to perform community service work at the public library in Midland, Texas, where Parker was employed as a maintenance man. The men conversed frequently, and often the conversations focused on selling women into prostitution. These conversations eventually evolved into a plot against a specific woman. Alderink maintained a grudge against Susan Lindsey, the wife of a friend, because Susan Lindsey had previously implicated Alderink in connection with a stolen check. Parker suggested that Alderink could get revenge by abducting Susan Lindsey and selling her into "white slavery". Alderink agreed.

On November 7, 1986, a state district judge entered an order releasing Alderink from custody and transferring supervision of his probated term to the State of Michigan. Alderink, his father, and June Gilkerson, a volunteer at the Midland County "Restitution Center," a halfway house where Alderink resided, were present at this hearing. At this time, June Gilkerson was having an affair with Alderink.

Following Alderink's release from custody, he and Parker traveled to Rockdale, where Susan Lindsey resided. They found the apartment complex where Lindsey resided but called off the plan when they were unable to ascertain which unit was rented by Lindsey. On the return drive to Midland, Parker suggested abducting June Gilkerson in lieu of Susan Lindsey; Alderink agreed.

The following morning Alderink phoned June Gilkerson and asked her to meet him. June Gilkerson told her grandmother that she was going to assist a probationer who was being released. When June Gilkerson arrived for her meeting with Alderink, he entered her car and drove to an agreed point where he asserted he wanted to tell a friend good-bye. Alderink exited June Gilkerson's vehicle, and Parker entered it on the driver's side. He handcuffed Gilkerson, taped her eyes and mouth, placed a sleeping bag over her, and put her in the

back of his pick-up. Alderink drove June Gilkerson's vehicle to the motel where his father was staying, and they left for Michigan. Gilkerson's car, purse, shoes, notebook, and car keys were found that night at Alderink's motel. Parker's fingerprints were found on the roof of the car just above the driver's door.

Initially, the police investigation focused on Alderink. They telephoned him, and questioned him on numerous occasions. Two exculpatory statements regarding his whereabouts on November 7, 1986, proved false. In his third exculpatory statement, Alderink asserted that he was with Parker in Austin, Texas, that night. Police questioned Parker about this. Parker denied seeing Alderink and gave what proved to be a false statement, that he was in "Boystown," Mexico. Subsequently, the police arranged a confrontation between Parker and Alderink during which Alderink was equipped with a recording device; Parker at this time held up a note for Alderink to read that stated June Gilkerson had been cremated. Alderink subsequently pleaded guilty in state court to a charge of kidnapping June Gilkerson and received a twenty year term of imprisonment contingent upon testifying against Parker. Parker was convicted on both counts in the instant case and received two consecutive life sentences. Timely appeal followed.

## II. *DISCUSSION*

Parker has directed this Court's attention to a variety of alleged errors which he asserts warrant reversal of his convictions. We have reviewed these allegations and conclude that no reversible error has been shown. Parker's primary grounds for relief are discussed below.

### A. *Venue*

■ Parker asserts that the district court erred in denying his Rule 21(a) motion to transfer venue. Federal Rule of Criminal Procedure 21(a) indicates that the district court must grant a change of venue when it is "satisfied that there exists in the district where the prosecution is pending so great a prejudice against the defendant

[that he] cannot obtain a fair and impartial trial." This rule vests substantial discretion in the district court as to the granting or denying of such a motion; in order to disturb the court's ruling on appeal, an abuse of discretion must be shown. *See United States v. Noland,* 495 F.2d 529 (5th Cir.), *cert. denied,* 419 U.S. 966, 95 S.Ct. 228, 42 L.Ed.2d 181 (1974).

In support of his argument that the district court abused its discretion by failing to transfer venue, Parker points to the widespread coverage of June Gilkerson's disappearance and the subsequent investigation. Pervasive, adverse pretrial publicity has the potential to taint the perspective of the community from which a jury panel is selected. When the proceedings surrounding the investigation and prosecution of a particular crime are highly publicized, courts must inquire as to whether the defendant has been denied an impartial jury that will render a verdict based upon the evidence presented at trial rather than on information received from outside sources. *See Irvin v. Dowd,* 366 U.S. 717, 723, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961).

■ Exposure to pretrial publicity, however, does not necessarily destroy a juror's impartiality. *Calley v. Callaway,* 519 F.2d 184, 205–06 (5th Cir.1975) (en banc), *cert. denied* sub nom. *Calley v. Hoffmann,* 425 U.S. 911, 96 S.Ct. 1505, 47 L.Ed.2d 760 (1976). Consequently, a change of venue should not be granted on the mere showing of widespread publicity. *Id.*

It is no longer necessary for a defendant to show that community prejudice permeated the jury box. Rather, as this Court indicated in *United States v. Chagra,* 669 F.2d 241, 250 (5th Cir.), *cert. denied,* 459 U.S. 846, 103 S.Ct. 102, 74 L.Ed.2d 92 (1982),

> an appellant can demonstrate that prejudicial, inflammatory publicity about his case so saturated the community from which his jury was drawn as to render it virtually impossible to obtain an impartial jury.... Proof of such poisonous publicity raises a presumption that appellant's jury was prejudiced, relieving him

of the obligation to establish actual prejudice by a juror in his case.

*Id.* (citations omitted). Parker has documented that this case received extensive pretrial publicity. However, he has not demonstrated that this publicity was in excess of the sensationalism inherent in the crime or that pervasive community prejudice resulted from this publicity. The publicity the case received prior to trial was not inflammatory, nor was it of a nature that would influence a juror's decision. Parker did not confess, he had no prior criminal record, and he was frequently referred to as a "war hero" and a "gentleman." As the Government correctly notes, because the publicity here did not involve incriminating information, it was not the type that would influence a decision by a potential juror. *See also, United States v. Williams*, 817 F.2d 1136, 1137 (5th Cir. 1987) (on petition for rehearing) (noting that where the substance of the publicity cannot be taken as probative of guilt, a serious question of possible prejudice is not raised.)

Additionally, we feel compelled to note that even if the community was saturated with inflammatory pretrial publicity sufficient to raise a presumption of prejudice, that presumption may be rebutted. "[T]he government may demonstrate from the *voir dire* that an impartial jury was actually impanelled in appellant's case.... If the government succeeds in doing so, the conviction will stand despite appellant's showing of adverse pretrial publicity." *United States v. Harrelson*, 754 F.2d 1153, 1159 (5th Cir.1985) (citing *Chagra*, 669 F.2d 241, 250). In the instant case, the voir dire conducted by the district judge was sufficient to ferret out any latent prejudice.

In this case, the trial court denied Parker's motion to voir dire the veniremen individually. Additionally, the trial court refused to submit forty-six proposed questions to the prospective jurors. Parker asserts these rulings by the trial court resulted in a denial of a fair trial because juror prejudice stemming from the pretrial publicity was not adequately explored. We disagree. " '[T]he obligation to impanel an impartial jury lies in the first instance with the trial judge, and because he must rely largely on his immediate perceptions, federal judges have been accorded ample discretion in determining how best to conduct the voir dire.' ... Therefore, the district court's decision to employ a particular procedure will not be lightly overturned." *Chagra*, 669 F.2d at 250. A district court does not abuse its discretion as long as it adopts procedures that create a reasonable assurance that any prejudice of the jurors will be discovered, if present. *United States v. Nell*, 526 F.2d 1223, 1229 (5th Cir.1976).

The district court in this case employed a hybrid procedure, questioning the jurors as a group and individually, as necessary. Each prospective juror who responded affirmatively to the question whether they were familiar with the case was questioned separately. One potential juror was immediately excused by the court as a result of this questioning. Numerous questions exploring the prospective jurors' attitudes, familiarity with the persons and places involved, and exposure to news photographs of Parker were asked. Based on the meticulous method with which the district court approached the voir dire, we conclude that there was a "reasonable assurance that prejudice would be discovered if present." *United States v. Hawkins*, 658 F.2d 279, 283 (5th Cir.1981).

Parker has failed to demonstrate reversible error in this area. We cannot conclude that the district court abused its discretion either in the method of voir dire employed or in failing to transfer venue. Parker has not demonstrated that his right to a fair trial has been abridged.

B. *The Hataway evidence*

■ Parker asserts that the district court committed reversible error in excluding "indirectly exculpatory" testimony relative to the conduct of a Government witness, Alan Hataway. It was Parker's contention at trial that Hataway was the prime suspect in the disappearance of June Gilkerson. To support his argument that Hataway was the perpetrator, Parker points to

the testimony, presented away from the jury in the form of a bill of exception, of the female manager of the Wrangler Club. The manager testified that Hataway had offered her money for sex and frightened her. There was some indication that June Gilkerson and Hataway were at this club the night before Gilkerson disappeared.

While admitting that the testimony was only indirectly exculpatory and hearsay, Parker argues that its exclusion was improper. He argues that the testimony should be admissible because of its potential to assist the accused. *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). The Court cannot push the interpretation of *Chambers* to such a length. The link between Hataway and June Gilkerson's disappearance was tangential at best. The Government has effectively discredited this alleged link. For example, the Government points out that Hataway offered money in order to obtain sexual favors for himself; no mention of prostitution was suggested.

The trial judge has broad discretion in ruling on questions of relevancy. There was no abuse of discretion by the trial court in refusing to allow questioning in this area.

### C. *Grand Jury Testimony*

Parker asserts that the district court should have suppressed his state grand jury testimony, including the false exculpatory statement in which he denied going to Austin, Texas, with Alderink, because a police officer was present during the proceeding. Federal Rule of Criminal Procedure 6(d) limits who may be present at a federal grand jury proceeding to the prosecutor; witness under examination; interpreter, if necessary; and court reporter. However, Texas state law permits police officers to be present in a state grand jury room during testimony. *Bridges v. State,* 656 S.W.2d 505, 507 (Tex.App.—Tyler 1982), *cert. denied,* 464 U.S. 838, 104 S.Ct. 129, 78 L.Ed.2d 125 (1983). Parker has cited no authority extending Rule 6(d) to the state proceeding.

Even if we were to conclude that such an extension of Rule 6(d) were proper, the Supreme Court has indicated that violations of Rule 6(d) are governed by a harmless error standard. *United States v. Mechanik,* 475 U.S. 66, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986). Because the essence of Parker's false exculpatory grand jury testimony was previously given to the police in the context of their investigation of Alderink, and was therefore cumulative of other admissible evidence, any error in admitting it was harmless.

### D. *Prosecutor's Argument*

First, Parker points to the Government's characterization of defense counsel's jury argument as "garbage." Parker notes that this characterization was objected to and asserts that it constitutes reversible error. Second, Parker contends that the following statement, which was not objected to, was an inflammatory remark and that it had a prejudicial impact on the jury's deliberations. The prosecutor's statement was "June Gilkerson made some mistakes. Maybe she popped the pill of Ecstacy? Does that deserve the death penalty? My gracious. She committed adultery, does that warrant the death penalty?"

This Court has stated that the test for determining prosecutorial misconduct in the context of closing argument is first, whether the remarks were improper, and second, whether they prejudicially affected substantive rights of the defendant. *United States v. Dorr,* 636 F.2d 117, 120 (5th Cir.1981). A harmless error analysis applies. *United States v. Hutson,* 821 F.2d 1015, 1021 (5th Cir.1987). The determination of whether prosecutorial misconduct was harmless requires consideration of the prejudicial statements, the efficacy of any cautionary instructions given by the district court, and the strength of the admissible evidence of guilt. If the defendant fails to object to an improper argument, this Court reverses only for plain error. *United States v. Livingston,* 816 F.2d 184, 195 (5th Cir.1987).

The "garbage" remark was promptly objected to. This objection resulted in an immediate instruction by the trial judge to disregard the remark. Our practice is based on the belief that the jury heeds the trial court's instructions. We have no reason to believe that the jury did not do so in this case. While this isolated remark might possibly be characterized as an unwarranted attack on defense counsel, in the context of this trial as a whole it seems relatively innocuous.

The prosecutor's rhetorical "death sentence" remark is somewhat more troublesome. Reference to June Gilkerson's death interjected a highly inflammatory element. However, because Alderink testified that Parker wrote and showed Alderink a note stating that Gilkerson had been cremated, there was some evidence in the record that June Gilkerson's kidnapping had culminated in her death.

In any event, because Parker did not object to this statement at trial, he must show that the statement amounted to plain error. "Plain error is error so great that it cannot be cured at trial.... It exists when any attempt to instruct the jury would only serve to focus the jury's attention on the statements." *United States v. Davis*, 831 F.2d 63, 66 (5th Cir.1987) (citations omitted). It is to be used sparingly, solely to prevent a complete miscarriage of justice.

This statement, although error, does not constitute plain error. An appropriate curative instruction could have been fashioned, had a contemporaneous objection been lodged. Moreover, there is no indication that Parker was convicted of the crime of conspiracy to kidnap June Gilkerson based on the jury's speculation that she had been murdered. Parker was convicted of conspiracy to kidnap Susan Lindsey on virtually identical evidence, and, as he asserts, Susan Lindsey was never physically harmed, nor was she aware of the plot against her. The jury did not distinguish between these two crimes on the basis of potential injury to the victim.

### E. *Consecutive Life Sentences*

■ The district court sentenced Parker to consecutive terms of life imprisonment on both conspiracy to kidnap counts. Parker contends that he cannot be ordered to serve consecutive sentences if he was guilty of only one conspiracy.

Parker's argument that only one conspiracy exists is not persuasive. Alderink testified that after the plot to kidnap Susan Lindsey failed, Parker suggested abducting June Gilkerson. The co-conspirators entered into two distinct agreements. One involved the plot to kidnap Susan Lindsey. The planning for this crime took place over a long period of time. It was planned with two objectives in mind: profit and to satisfy Alderink's desire for revenge. The conspiracy to kidnap June Gilkerson commenced only after the plans to carry out Susan Lindsey's kidnapping soured. The new plans required the co-conspirators to travel hundreds of miles to carry out the second conspiracy, and unlike the first conspiracy had profit as the sole objective. Whether the evidence shows one or multiple conspiracies is a question for the finder of fact. *United States v. Erwin*, 793 F.2d 656, 662 (5th Cir.), *cert. denied*, 479 U.S. 991, 107 S.Ct. 589, 93 L.Ed.2d 590 (1986). There was sufficient evidence for the jury to conclude that Parker entered into two separate criminal conspiracies.

Additionally, Parker argues that the consecutive life sentences violate the eighth amendment. Parker's cruel and unusual punishment argument is based on two factors: that he received the harshest sentence possible for both conspiracies (including the Susan Lindsey conspiracy which did not culminate in any physical harm); and that, under Texas state law, a conspiracy conviction is one felony grade less than the substantive offense. Parker points to the Supreme Court's pronouncement in *Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), that sentences must be proportionate to the crimes involved. *Id.* at 284, 103 S.Ct. at 3006. *Solem* provides that objective criteria such as the gravity of the offense and the harshness of the penalty, sentences imposed on other criminals in the same jurisdiction, and sentences imposed for the commission of the same

crimes in other jurisdictions, should guide a court's proportionality analysis. *Id.* at 292, 103 S.Ct. at 3010.

Parker's conspiracy crimes contemplated abduction forcibly to cause the subject to be transported in foreign commerce for purposes of prostitution. There are no comparable crimes in the state system. Therefore, this case does not lend itself to *Solem's* comparative approach. The district court was faced with the task of sentencing a defendant convicted of uniquely heinous and cruel crimes. The sentence imposed was not inappropriate; no error is discerned.

### III. *CONCLUSION*

Parker has also challenged the sufficiency of the evidence supporting his convictions as well as the propriety of the district court's rulings on his motions to suppress. These challenges are without merit. Parker has not demonstrated any reversible error. His convictions are affirmed.

AFFIRMED.