Eugene Lee STANDERFORD, Appellant,

v.

The STATE of Texas, State.

No. 2–94–511–CR.

Court of Appeals of Texas, Fort Worth.

Aug. 8, 1996.

Rehearing Overruled Oct. 3, 1996.

690

Joseph H. Lobley, for Appellant.

Tim Curry, Criminal District Attorney, Betty Marshall, Charles M. Mallin, Assistant Chiefs of the Appellate Section, Elizabeth A. Martin, Richard Alpbert, Lisa Mullin, Assistant Criminal District Attorneys, Fort Worth, for State.

Before DAY, RICHARDS and HOLMAN, JJ.

## OPINION

DAY, Justice.

Appellant Eugene Lee Standerford was convicted by a jury of involuntary manslaughter and sentenced to confinement for life in the Institutional Division of the Texas Department of Criminal Justice. His conviction arises from an alcohol-related collision in which Standerford killed a Fort Worth police officer who had stopped to help a stranded motorist. Because we find Standerford's five points of error to be without merit, we affirm the judgment of the trial court.

### Fact Summary

During the early morning hours of December 22, 1993, Police Officer Alan Chick stopped his patrol car to help Julie Wright jump-start her stalled pickup truck. Once the truck started, Wright returned to the driver's seat of the truck, and Officer Chick disengaged the jumper cables and put the truck's hood down. As the officer came to the driver's side of the truck to give Wright the cables, he turned his head. Wright saw bright lights reflected in Officer Chick's eyes and heard him mumble something under his breath. Wright felt a violent impact as a vehicle driven by Standerford hit her truck and Officer Chick, knocking him into the air.

Wright's brother-in-law, a passenger in the truck, was injured in the collision. As Wright sought help for her brother-in-law, she found Officer Chick lying unconscious in a pool of blood. Wright screamed for Standerford to help her, but Standerford stood by his car "scratching his head." Eventually, Wright located Officer Chick's police radio and summoned assistance. Police who arrived at the scene arrested Standerford for driving while intoxicated, and, when tested, Standerford's blood alcohol level was .15. Five days after the collision, Officer Chick died of massive head injuries, and a grand jury subsequently indicted Standerford for involuntary manslaughter. Standerford's conviction was enhanced by numerous prior convictions for driving while intoxicated.

### Point of Error One

■ In point of error one, Standerford claims that the trial court erred by overruling his objection to the causation portion of the jury's charge on guilt-innocence that authorized a lesser burden of proof than the law requires. Standerford argues that his trial counsel's defensive theory was that Standerford's intoxication was not a legal cause of Officer Chick's death. Standerford notes that the penal code provides that a person is criminally responsible if the result "would not have occurred but for his conduct, operating either alone or concurrently with another cause." TEX. PENAL CODE ANN. § 6.04(a) (Vernon 1994). He contends on appeal that the jury charge was erroneous because it stated that he was guilty even if his intoxication only contributed to cause the death, relying on *Robbins v. State*, 717 S.W.2d 348, 351–53 (Tex.Crim.App.1986) where the section 6.04(a) language was omitted from the jury charge.

At trial, Standerford complained that the jury charge read "by reason of such intoxication caused or contributed to cause the death of an individual, Alan Chick." Standerford complained about the "or contributed to" language and urged the trial court to rephrase the charge to read "the intoxication caused the death of Alan Chick." Thus, Standerford's contention on appeal that the jury charge did not properly include the section 6.04(a) language is not the same objection he made at trial. Because his point of error on appeal does not comport with his objection at trial, error, if any, is waived.[1] TEX. R. APP. P. 52(a), 74(d).

### Point of Error Two

■ In his second point of error, Standerford complains that, during the punishment

---

1. We note, however, that the jury charge stated that "A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, *unless the concurrent cause was* *clearly sufficient to produce the result and the* *conduct of the actor clearly insufficient."* [Emphasis added.] Thus, the instructions to the jury included the language that was omitted from *Robbins.*

phase, the trial court improperly overruled his objection to testimony from four witnesses concerning previous DWI convictions. He contends that because he "did nothing to mislead the jury or give a false impression concerning any detail of his prior convictions," the State should not have been allowed to examine the details of his previous convictions before the jury.

Although Standerford's argument was, at one point, the law in Texas, changes to the Code of Criminal Procedure allow introduction of evidence regarding "any matter the court deems relevant to sentencing, including but not limited to the prior criminal record of the defendant." TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(a) (Vernon Supp.1996).[2] Because the offense that Standerford was tried for occurred after September 1, 1993, the "new" version of article 37.07, section 3(a) applied.

In this case, the evidence adduced by the State was not only relevant to prove Standerford's character, but it was also admissible as a "circumstance of the offender," bearing on proper punishment in some respect apart from Standerford's character per se. *See Beasley v. State*, 902 S.W.2d 452, 462 (Tex. Crim.App.1995) (Clinton, J., concurring); *Anderson v. State*, 901 S.W.2d 946, 950 (Tex. Crim.App.1995). Thus, the trial court was within its discretion to allow testimony from the four witnesses regarding four of Standerford's previous DWI arrests. Point of error two is overruled.

### *Points of Error Three and Four*

■ In points of error three and four, Standerford contends that the trial court violated his rights under the United States and Texas Constitutions when it denied his motion for a change of venue. Standerford sought to have his trial moved out of Tarrant County, citing heavy publicity surrounding the collision.

The print and electronic media covered the December 22, 1993 accident and Officer Chick's death five days later. News accounts also demonstrated that the victim was a high-

ly decorated officer, having received fourteen commendations and been nominated in 1991 for Officer of the Year and that he left behind a widow, also a Fort Worth police officer, and two young children. Standerford's twelve previous arrests for DWI were disclosed, and those, too, were the subject of print and electronic news reports. Community groups, including Mothers Against Drunk Driving (MADD), staged protests at Dallas County courthouses, claiming that Standerford had been treated too leniently in his previous alcohol-related convictions. News organizations covered these protests as well. The media also covered Standerford's bond hearing.

At the hearing on the motion to transfer venue, Standerford called several criminal defense attorneys to testify that he could not receive a fair trial in Tarrant County. He also called to the stand three executives from local radio stations to discuss news coverage of, and listener reaction to, the events. Eventually, the trial court denied his motion to transfer venue.

■ When proceedings surrounding the investigation and prosecution of a particular crime are highly publicized, a trial court, upon motion, must inquire as to whether it is possible to select a jury from the affected community capable of rendering a verdict based upon the evidence rather than information received from outside sources. *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751, 756 (1961). The moving party has a heavy burden. *Beets v. State*, 767 S.W.2d 711, 743 (Tex.Crim.App.1987), *cert. denied*, 492 U.S. 912, 109 S.Ct. 3272, 106 L.Ed.2d 579 (1989). Under federal law, a defendant must prove that "prejudicial, inflammatory publicity about his case so saturated the community from which his jury was drawn as to render it virtually impossible to obtain an impartial jury." *United States v. Parker*, 877 F.2d 327, 330 (5th Cir.), *cert. denied*, 493 U.S. 871, 110 S.Ct. 199, 107 L.Ed.2d 153 (1989). Under Texas law, the defendant must demonstrate the existence of prejudice in the community such that the likelihood of obtaining a fair trial is doubtful.

---

**2.** *See* Act of June 15, 1989, 71st Leg., ch. 785, § 4.04, 1989 Tex. Gen. Laws 3471, 3492; Act of

May 29, 1993, 73rd Leg., ch. 900, § 5.05, 1993 Tex. Gen. Laws 3586, 3759.

*Narvaiz v. State,* 840 S.W.2d 415, 428 (Tex. Crim.App.1992), *cert. denied,* 507 U.S. 975, 113 S.Ct. 1422, 122 L.Ed.2d 791 (1993).

Proof of widespread publicity, including potential jurors' exposure to it, does not justify a change of venue under either federal or state law. *Calley v. Callaway,* 519 F.2d 184, 205–06 (5th Cir.1975), *cert. denied,* 425 U.S. 911, 96 S.Ct. 1505, 47 L.Ed.2d 760 (1976); *Morris v. State,* 488 S.W.2d 768, 772 (Tex.Crim.App.1973). A defendant must show that the pretrial publicity: (1) is prejudicial and inflammatory, and (2) so saturated the community from which his jury is to be drawn that it would be virtually impossible to obtain a fair and impartial trial. *Parker,* 877 F.2d at 330–31; *Teague v. State,* 864 S.W.2d 505, 509 (Tex.Crim.App.1993), *overruled on other grounds, Robertson v. State,* 871 S.W.2d 701 (Tex.Crim.App.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 155, 130 L.Ed.2d 94 (1994). Under the first prong, a defendant must show proof of "non-objective sensationalism." *Parker,* 877 F.2d at 331; *Beets,* 767 S.W.2d at 744. Under the second prong, it must be shown that this "corrupting" press was exposed to the community "in excess" of that which would normally be expected given the "sensationalism inherent in the crime." *Parker,* 877 F.2d at 331; *Beets,* 767 S.W.2d at 743. Once the moving party satisfies this burden, the nonmoving party has the opportunity to rebut the presumption. *Parker,* 877 F.2d at 331. For example, the State "may demonstrate from voir dire that an impartial jury was actually impanelled in the [defendant's] case." *Id.*

The circumstances surrounding Standerford's offense were tragic. The accident occurred three days before Christmas, and Officer Chick died two days after the holiday. Assistance was summoned to the scene by the driver of the previously-stalled pickup truck, who screamed for help into the injured officer's radio. Family and friends of Officer Chick conducted a round-the-clock vigil, and the officer's wife was forced to make the decision to remove him from life-support systems. These facts were reported by the media, along with accounts of Standerford's previous drunken driving arrests as well as involvement in anti-drunken driving protests

by Officer Chick's widow. Albeit tragic and saddening, the newspaper, television, and radio coverage proffered at the change of venue hearing was accurate and was not sensational. We note also that most of the news coverage of the events occurred in December and January, immediately after the collision and Officer Chick's death, and that only isolated stories were published between February and May. The change of venue hearing was in June 1994, six months after the collision, and jury selection for trial on the merits began in October 1994, ten months after the collision. Given the evidence before the trial court, including testimony from several defense attorneys that other high-profile cases had been successfully tried in Tarrant County, we conclude that the trial court did not abuse its discretion in refusing the motion for change of venue. Points of error three and four are overruled.

*Point of Error Five*

In his final point of error, Standerford complains that he received ineffective assistance of counsel at trial. He brings a litany of complaints, beginning with defense counsel's conduct during jury selection and concluding with comments made during closing arguments. We begin our analysis by outlining the standard of review before discussing each of his specific complaints.

The standard for appellate review of effectiveness of counsel at the guilt-innocence phase of a noncapital trial was announced in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) and adopted by the court of criminal appeals in *Hernandez v. State,* 726 S.W.2d 53, 57 (Tex. Crim.App.1986). *Ex parte Menchaca,* 854 S.W.2d 128, 131 (Tex.Crim.App.1993).

An appellant's claim that counsel's assistance was so defective as to require reversal of a conviction has two components. First, the appellant must show that his counsel's performance was deficient; second, he must show the deficient performance prejudiced the defense. *See Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693.

The first component is met by showing that appellant's trial counsel made

errors so significant that he was not functioning as the "counsel" guaranteed by the Sixth Amendment to the United States Constitution. *Id.* When a convicted defendant contends his trial counsel was ineffective, the defendant must show the attorney's representation fell below an objective standard of reasonableness. *Id.* at 687–88, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. The issue is whether counsel's assistance was reasonable under all the circumstances and prevailing professional norms at the time of the alleged error. *Id.* at 688–89, 104 S.Ct. at 2065, 80 L.Ed.2d at 694. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690, 104 S.Ct. at 2066, 80 L.Ed.2d at 695.

 The second prong of *Strickland* requires a showing that counsel's errors were so serious that they deprived the defendant of a fair trial, a trial whose result is reliable. *Id.* at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. A defendant must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

 The question for our review is whether there is a reasonable probability that, absent counsel's errors, the factfinder would have had a reasonable doubt on the issue of guilt, considering the totality of the evidence. *See id.* at 695, 104 S.Ct. at 2069, 80 L.Ed.2d at 698. The ultimate focus of our inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. *See id.* However, our scrutiny of counsel's performance must be highly deferential, and every effort must be made to eliminate the distorting effects of hindsight. *See id.* at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694.

 Standerford begins by highlighting comments his counsel made during jury

selection. Specifically, counsel informed the venire that he was board-certified in criminal law, had 27 years' experience as an attorney, had been retained by Standerford, and was not representing his client at the taxpayers' expense. Although Standerford states that these comments "clearly ha[d] nothing to do with trial strategy," he cites no authority for this assertion. We conclude that it is entirely possible that trial counsel was attempting to establish his own credibility before the jury and trying to portray Standerford as someone who was meeting his financial responsibilities.[3] Mere disagreement with strategic decisions will not satisfy the evidentiary burden required to prove that counsel has been ineffective. *See Miniel v. State,* 831 S.W.2d 310, 325 (Tex.Crim.App.), *cert. denied,* 506 U.S. 885, 113 S.Ct. 245, 121 L.Ed.2d 178 (1992).

 Standerford next complains that his counsel misstated the law in front of the venire when he said that "reasonable doubt can be based on anything that you hear from the witness stand." He appears to be arguing that counsel implied there was *only* one source of reasonable doubt, but the comment, taken in context, was an accurate statement of the law. Specifically, counsel's entire statement was:

Now, reasonable doubt can be based on anything that you hear from the witness stand that's admitted as evidence before you. In other words, the State has to prove the elements of the offense beyond a reasonable doubt. But if their testimony was about what color of socks somebody was wearing, they don't have to prove what color of socks somebody was wearing beyond a reasonable doubt. But the inability of a witness to remember what color of socks somebody was wearing may give rise to you having a reasonable doubt about that person's testimony.

Do you understand that reasonable doubt can be based on anything that comes in off that witness stand there?

---

**3.** Since this is a direct appeal, we do not have a sufficient record indicating exactly what counsel's strategy was. *See Jackson v. State,* 877 S.W.2d 768, 772 (Tex.Crim.App.1994) (Baird, J.,

concurring) (ineffective assistance claims should be raised collaterally and not on direct appeal because the record would generally be insufficient).

Because this statement in context cannot be construed as a misstatement of the law, no ineffectiveness has been shown. *Strickland,* 466 U.S. at 686–90, 104 S.Ct. at 2066–69, 80 L.Ed.2d at 695–98.

■■■ Standerford complains that his trial counsel "went out of his way to denigrate his chosen profession and his own credibility" and highlights the following comment from voir dire: "[L]et me be honest with you. I guess any time a lawyer says, 'Let me be honest with you', you probably ought to look askance at him a little bit."

What Standerford apparently sees as denigration, we fairly view as a self-deprecating concession that many members of society hold unfavorable views about attorneys. Standerford provides no authority for the apparent proposition that such denigration constitutes ineffective assistance or to sway us from the position that the comment was trial strategy.

■■■ Standerford takes issue with several other comments trial counsel made during voir dire. Specifically, counsel said that he was "amazed" at the number of people who noted on their jury questionnaire that they or a loved one had been adversely affected by alcohol abuse. Counsel also stated that "MADD Mothers pretty much has one agenda," and then later replied "Good for you," when told that one venireperson got together with his father for a drink. Standerford asserts that the remarks showed that his trial counsel hadn't gotten "The Message," but he does not specify what message his attorney overlooked.

Each of these comments, again, could have fit neatly into counsel's trial strategy. For example, after stating that he was "amazed" at the number of people affected by alcoholism, counsel related an anecdote indicating that there is "nothing more virtuous" than someone who had given up a vice and asked whether the veniremembers' experiences with alcohol abuse could prevent them from being impartial about the case before them. The comment about "MADD Mothers" was followed by a similar query. Finally, it is entirely possible that counsel replied "Good for you" because the venireperson got together with his father to socialize and not merely because the venireperson consumed alcohol. Standerford has provided no authority for his contention that these comments were anything other than trial strategy, and as such, we do not view them as an indication that counsel was ineffective.

Standerford complains that his attorney did not ask "a single panel member whether (s)he had 'a bias or prejudice in favor of or against'" him or against the law. We note that the trial court spent much of the previous day-and-a-half asking such questions. We believe that counsel very likely omitted those questions during his portion of voir dire to avoid repetition and, thereby, boring or otherwise alienating the panel.

■■■ Standerford also maintains that counsel was ineffective in failing to object to the trial court's misstatement of the law when it instructed the venire panel that, "It is also your job as the Jury to determine the facts from the evidence . . . and decide what happened and . . . in determining the facts, in deciding what the facts are." Standerford fails to demonstrate how the trial court's comments were a misstatement of the law and, therefore, fails to show how counsel was inadequate.

■■■ Standerford labels as "unprofessional error" his attorney's attempt to have Officer Chick's widow removed from the courtroom after her testimony. We remind Standerford that the "Rule" had been invoked, and counsel was acting within the law in making the objection as to Lisa Chick's presence. Quite reasonably, Standerford's counsel had to decide whether to ask the trial court to remove the witness from the courtroom after her testimony, in accordance with the Rule, or risk having the jury possibly fixate its attention on Officer Chick's widow during the duration of the proceedings. We fairly view counsel's decision to make the objection as trial strategy, and Standerford provides no authority to contradict that interpretation.

■■■ Standerford next complains about his attorney's cross-examination of Officer B.J. Lewis, the officer who investigated the accident. Standerford contends that counsel

elicited "unhelpful" testimony that Officer Chick was not in the lane of traffic when he was hit, that the officer's overhead emergency lights were on at the time of the collision, and that Standerford did not appear to be upset after the accident. However, the jury had already been told during direct examination that Officer Chick was not in the lane of traffic at the time of the collision and that his overhead emergency lights were on before the collision. Counsel's reminding the jury of these disclosures did nothing to harm Standerford's defense that the collision was a result of car trouble, slick roads, and poor lighting. Additionally, although the jury was reminded that Standerford did not appear upset after the collision, counsel also elicited from the witness the concession that Standerford could have been dazed or addled by the wreck. Again, we see nothing to indicate anything other than trial strategy on the part of Standerford's attorney.

■ As to Standerford's complaint that his attorney waived an opportunity to make an opening statement, we note that such a statement would have given the State a preview of the defense's strategy. Counsel clearly made a tactical decision, and no ineffectiveness can be shown by this instance.

■ Standerford's counsel recalled Wright, the stranded motorist whom Officer Chick was helping just before the accident. Standerford faults his counsel for eliciting from Wright the additional facts that she had married her, then, brother-in-law who was in her truck at the time of the collision and that she had been paid by Standerford's insurance carrier for her losses. Neither of these disclosures was so damaging as to constitute ineffective assistance. The fact that Wright later married the man who had been injured in her truck gave counsel the opportunity to suggest that Wright may have been distracted and her recollection of events shaded by her concern for the passenger. Also, that Wright was paid by Standerford's insurance carrier does not mean Standerford was intoxicated at the time of the collision; it merely

indicates that Standerford was in fact the one driving the car.

■ Standerford additionally faults his attorney for introducing into evidence medical records which showed that Standerford's prosthetic leg and artificial hip were caused by a previous accident. Counsel offered the records to provide a possible explanation for Standerford's difficulty in walking at the scene of the accident. Standerford's counsel did his best to downplay the possible negative effect of an admittedly calculated risk in introducing the records by highlighting on redirect examination that the records did not establish that Standerford had been intoxicated in the accident which cost him his leg.

■ Standerford also complains that counsel "bolstered the State's case by the two expert witnesses he called to testify regarding" Standerford's blood-alcohol level. We note that Standerford's counsel actually called only one expert, not two. The expert, John Castle, stated that Standerford's blood-alcohol level tested between .18 and .19; however, counsel also elicited from Castle the statement that it was possible for a person who had not been drinking to have a large amount of alcohol present in the blood stream. Regarding this complaint, Standerford again fails to demonstrate how counsel was inadequate.

■ Standerford next complains about the closing argument made by his attorney, because counsel "remind[ed] the jury, four times, that [Standerford] hadn't testified." In three of those instances, counsel was reminding the jury that his client had no obligation to testify and that Standerford's silence could not be used against him. In the final instance, when counsel asked rhetorically, "Who is to say that [Standerford] wasn't going to pull over in that safety zone because his car wasn't running?" he was reminding the jury of Standerford's defensive theory.[4]

Standerford's defense counsel is also faulted for having "attack[ed] the morals of Ms. Wright and her future husband" when he reminded the jury that Wright had left her

---

4. Standerford contends that this final comment was an attempt to "implicate" Wright, who had pulled onto the shoulder when her truck stalled, in the collision. We do not read this statement as an attempt to shift the blame to Wright.

child at home with her common-law husband and was stranded with her intoxicated brother-in-law. However, Standerford does not demonstrate that this was anything other than a tactical decision or that it was evidence that his counsel fell below the *Strickland* standard.

Additionally, Standerford faults counsel's performance with respect to the change of venue hearing and his attorney's alleged failure to reurge his change of venue motion after voir dire. Standerford asserts that counsel should have shown how many times each television or radio spot was aired and should have conducted opinion polls to demonstrate the level of bias in the community. We note that Standerford's counsel provided the trial court with ample examples of media attention to the case through clippings from newspapers, radio spots, and ratings statistics indicating the number of listeners to the stations which reported on the collision. That counsel *could* have done more does not mean that his performance fell below a minimum level of competence.

We conclude that counsel's conduct reflected a detailed understanding of the facts of the case and his actions were reasonably founded in thoughtful trial strategy. Because we hold that Standerford's counsel's representation did not fall below an objective standard of reasonableness, we need not address the second prong of *Strickland*. Accordingly, point of error five is overruled.

The judgment of the trial court is affirmed.