IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 8, 2008

Charles R. Fulbruge III
Clerk

No. 06-41528

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

ARZELL GULLEY

Defendant - Appellant

Appeal from the United States District Court
for the Eastern District of Texas, Beaumont

Before KING, DeMOSS, and SOUTHWICK, Circuit Judges.

PER CURIAM:

On April 20, 2005, Arzell Gulley was charged in a two-count indictment. Count One charged Gulley with the murder of Daryl Brown in violation of 18 U.S.C. § 1111, and aiding and abetting Brown's murder in violation of 18 U.S.C. § 2. Count Two alleged that Gulley possessed a dangerous weapon in a federal prison in violation of 18 U.S.C. § 930(c). A jury found Gulley guilty of both counts on June 28, 2006. Gulley now appeals, arguing that his conviction should be reversed because: (1) there was insufficient evidence to prove guilt; (2) the district court improperly excluded evidence of Brown's specific prior acts of violence; (3) the district court refused to conduct an in camera hearing to determine whether his due process rights were violated as a result of pre-

indictment delay; (4) he received ineffective assistance of counsel; and (5) he was not present when the district court instructed the jury to continue deliberating. Finding no reversible error, we affirm.

## I.  BACKGROUND

Arzell Gulley and his original co-defendant, David Jackson, were federal inmates incarcerated in the United States Penitentiary, Beaumont, Texas ("USP-Beaumont").  Between 5:00 p.m. and 8:30 p.m., the inmates at USP-Beaumont are free to intermingle with each other outside their housing units in an area referred to as the "compound."  On December 16, 1999, at approximately 6:00 p.m., Gulley and Jackson began arguing with another inmate, Daryl Brown, while in the compound.

The evidence concerning the initial events conflicted, but it was undisputed that it ended with Gulley and Jackson chasing Brown into Housing Unit 3B-1 while carrying shanks.  Each housing unit at USP-Beaumont, including Unit 3B-1, was equipped with surveillance cameras.  Camera footage from six different cameras showed that Gulley and Jackson chased Brown throughout Unit 3B-1 until Brown ran into cell number 125.  Gulley and Jackson, in that order, followed Brown into the cell.  Inmates Jerome Prince and Victor Richards quickly exited the area after Gulley and Jackson entered the cell.

A fight ensued inside the cell, although the surveillance cameras were unable to capture images of the occupants from the waist up.  After approximately thirty seconds, Gulley and Jackson walked out of cell number 125, leaving Brown lying on the floor. They proceeded in different directions, but were approached by correctional staff and complied with orders to lay down on the floor.  A correctional officer later found a shank on a chair close to where Gulley lay on the floor.

While Gulley and Jackson were lying on the ground, Brown exited the cell, bleeding profusely from his neck and chest and holding Jackson's weapon. He advanced towards Jackson, but collapsed. Brown was taken to an area hospital where he was pronounced dead. It was concluded in the autopsy report that Brown suffered from eleven knife wounds, but a single strike that pierced the upper lobe of his left lung and the pericardial sac of his aorta caused his death.

The Government did not bring charges against any defendant based on these events until November 19, 2003, when Gulley and Jackson were indicted for unlawful possession of weapons in a federal prison. That indictment was voluntarily dismissed by the Government on February 17, 2004. Over a year later, on April 20, 2005, Gulley and Jackson were re-charged in this case in a two-count indictment. Count One alleged premeditated murder in violation of 18 U.S.C. § 1111, and aiding and abetting premeditated murder in violation 18 U.S.C. § 2. Count Two alleged that Gulley and Jackson possessed dangerous weapons in a federal prison in violation of 18 U.S.C. § 930(c). On March 16, 2006, Gulley filed a motion to sever his trial from Jackson's, arguing that it would prejudice his case to try him with Jackson, who he claimed bore sole responsibility for Brown's death. The district court granted the motion on April 6, 2006.

On April 18, 2006, Gulley filed a motion to dismiss the case for pre-indictment delay and requested discovery and a hearing on the motion so that he could show that: (1) the Government intentionally delayed the prosecution to gain a tactical advantage; and (2) he was prejudiced by the delay. On April 25, 2006, the Government responded that "[t]he reason for the delay in this case involved investigative and prosecutorial resources, scientific testing procedures, and the Department of Justice's Protocol on the prosecution of death penalty eligible cases." Rather than prejudicing Gulley, the Government contended that as a result of the delay the prosecution decided not to seek the death penalty.

Moreover, the Government asserted that the motion should be denied because there was no evidence of any prejudice to Gulley. On May 12, 2006, the district court decided to carry the motion forward until the end of the trial in order to better assess whether Gulley suffered prejudice. The court reasoned that while the Government's delay was "curious and wondering, that doesn't mean it [was] prejudicial necessarily." The district court did not permit any discovery into the Government's prosecutorial decisionmaking and refused to hold an in camera hearing.

On June 1, 2006, the Government filed a motion in limine to exclude any reference to specific acts of violence previously committed by Brown, other than opinion or reputation testimony, unless Gulley had actual knowledge of the acts before the attack. On June 14, 2006, Gulley filed a response arguing that while he "under[stood] that specific acts of misconduct committed by Brown at other institutions or on other days may well be inadmissible," he ought to be able to introduce testimony of specific acts Brown committed on the day of his death in order to support a self defense claim. Specifically, Gulley sought to show that: (1) Brown threatened another inmate around four to six hours before his death; (2) Brown approached an inmate and requested weapons for Brown's associates; and (3) Brown had a knife in his hand immediately before the altercation broke out in the compound. On June 14, 2006, the district court granted the motion in limine generally, and specifically prohibited Gulley from introducing evidence that Brown allegedly assaulted another inmate or sought to procure weapons on the day of his death. The district court reasoned that the evidence was inadmissible because Gulley did not contend that he had actual knowledge of those acts. On the other hand, as the Government conceded, the district court ruled that Gulley could introduce evidence that Brown had a knife immediately before the fight began.

Gulley's seven-day trial began on June 19, 2006. The Government offered testimony from correctional officers who observed Gulley and Jackson in a verbal altercation with Brown just outside Unit 3B-1 in the compound. Brown, who the correctional officers testified was unarmed and acting alone, took off his jacket and shirt and assumed a fighting position. Officer Chopane then heard Jackson yell "let's get that mother fucker," whereupon both Gulley and Jackson pulled shanks. The officers all testified that Brown began to flee and that Gulley and Jackson chased him into Unit 3B-1. None of the officers saw any other inmates participating in the fight or taking any other type of aggressive action.

The Government also showed the jury footage from the six surveillance cameras, which captured Brown's flight down the corridors of Unit 3B-1. Gulley and Jackson could both be seen at various times holding objects in their hands; Brown did not appear to be holding a shank or other weapon. One of the video tapes showed Brown pausing from his flight at one point to pick up a microwave, which he threw at Jackson. He then continued to run into cell number 125, with Gulley and Jackson entering after him. Although the video only captured images of the inmates from the waist down once they entered the cell, it appeared that Brown was finally cornered against the far wall of the cell.

Inmate Prince, who could be seen in the video footage with inmate Richards evacuating the area of cell number 125, also testified at the trial. He stated that while he was standing outside of cell number 125, Brown fled into it and Gulley and Jackson followed him in. Moreover, Prince testified that as Gulley and Jackson approached the cell, Gulley told him: "we're going to kill this nigger, get out of here." Prince did not see Brown killed because he quickly left the area, but he testified that he did observe Brown crawling on the ground of the cell, trying to escape from Gulley and Jackson.

The Government's expert witness, Dr. Tommy Brown, testified that Brown was fatally wounded when a blade pierced the medial aspect of his lung and his

aorta. There was no evidence that Gulley's shank had any of Brown's blood on it, although DNA analysis confirmed that his gloves and pants were stained with trace amounts of Brown's blood. Dr. Brown opined on direct examination that the shank possessed by Jackson was the weapon that caused the fatal wound, although it was possible that the shank found near Gulley inflicted three of Brown's more minor wounds. On cross-examination, Dr. Brown conceded that in his professional opinion Jackson's blade caused all of the wounds.

Finally, in order to show consciousness of guilt, the Government introduced evidence that Gulley and Jackson, along with another inmate, escaped from a federal correctional institute on July 10, 2005, shortly after being arraigned in this case. According to the testimony, Jackson and the third inmate were able forcibly to remove the prison keys from a correctional officer, which they used to free Gulley from his cell. Gulley did not physically harm anyone during the escape, but he did threaten a female officer in order to coerce her to open the prison gates. He was apprehended shortly after escaping.

In his defense in chief, Gulley sought to show that Brown was a violent person who intended to cause Jackson harm and that Gulley was attacked because Brown mistakenly associated Gulley with Jackson. Neither Gulley nor Jackson testified, but Gulley introduced testimony from other inmates that: (1) Brown had a reputation for violence; (2) Brown was seen brandishing a weapon both earlier in the day and immediately before the fight broke out in the compound; and (3) Brown and his friends ambushed Jackson and Gulley. For example, inmate Matt Lindsey testified that Brown was "bad news" and "violent"; that he had slapped another inmate the morning of Brown's death and chased that inmate with a shank; and that Brown had threatened him on the same day. Inmate Andres Aguiar, meanwhile, testified that he saw Brown waylay Jackson with a knife while two of Brown's friends simultaneously attacked Gulley.

In addition, Gulley called a correctional officer, who testified that Jackson took credit for murdering Brown. Officer Mike Mattes stated that Jackson:

> requested to speak to me, and I came to the cell door where he was standing, and he stated to me that he did not want to accept a cellee, another individual into the cell where he was at, and that he stated to me that "I'm through playing games with you people, and if you don't believe me, I will kill again. Look at the tapes."

Officer Mattes testified that he "absolutely" knew that Jackson was referring to the tapes capturing the murder of Brown, although he did not inquire further into the incident because Jackson refused to continue their discussion. He conceded that Jackson never said: "I was the only one involved [in Brown's murder.]"

Finally, Gulley presented the testimony of Bob Henderson, a crime scene reconstructionist and expert in blood stain pattern analysis. Henderson testified that he had reviewed reports by prison staff and the FBI, the autopsy report, photographs of the weapons that were involved, and photographs of the various participants' clothing. Based on this evidence, he concluded that there was insufficient evidence to prove that either Gulley or Jackson struck the mortal blow. On cross-examination, Henderson viewed for the first time one of the surveillance videos. Although the video did not alter his opinion at the time, he later realized it conclusively proved that Gulley did not strike the mortal wound. Defense counsel sought to recall Henderson to testify to his most recent opinion, but the district court refused to permit the additional testimony because Henderson had never provided a report on the issue.

After the close of the evidence, on June 26, 2006, Gulley moved for a judgment of acquittal, which the district court denied. On June 27, 2006, before closing argument, Gulley renewed his motion to dismiss the case for pre-indictment delay. Gulley argued that he was prejudiced because the delay resulted in the loss of a video that might have contained images supporting his

7

assertion of self defense. The district court denied the motion because there was no evidence that any missing video existed.

That same morning, the jury heard closing arguments, received the jury instructions and verdict form, and retired for deliberation. At approximately 3:30 p.m., the jury sent a note to the district court judge, stating that "members of the jury wants recess [sic] for the day in order to collect thoughts and reflect on all points made about the case. Jury will convene at 9:00 a.m. Wednesday." Defense counsel were present, but the record is silent as to whether Gulley was present. The district court informed counsel that it was going to instruct the jury to deliberate until 5:00 p.m., but defense counsel objected that this might lead to juror coercion. Defense counsel suggested that the district court instead instruct the jury to deliberate until 4:00 p.m. Accordingly, the district court, responded to the jury with a note requesting that they "please deliberate until 4:00, then please return in the morning at 10:00 a.m."

The next morning, on June 28, 2006, at approximately 10:15 a.m., the jury notified the district court that it had reached a verdict. The jury found Gulley guilty of both counts of the indictment. On October 4, 2006, Gulley was sentenced to life imprisonment. He now appeals his conviction.

## II. ANALYSIS

### A. Sufficiency of the Evidence

Gulley argues that there was legally insufficient evidence to support his conviction for murder or for aiding and abetting murder. He emphasizes that there was no eye-witness testimony or video evidence proving that he caused Brown's death. Nor was there any evidence that the weapon he possessed caused Brown's fatal wounds. While Brown's blood was found on his gloves, Gulley argues that evidence merely proves that he was in the same area as Brown when Jackson murdered him. To be legally sufficient, Gulley contends, the prosecution was required to prove that he associated himself with the

murder by helping to facilitate the crime in some manner—by restraining Brown or blocking Brown from exiting the cell, for example. He argues, however, that there was no such evidence in this case.

Our review of the sufficiency of the evidence is "highly deferential to the verdict." United States v. Harris, 293 F.3d 863, 869 (5th Cir. 2002). The court asks "'whether the evidence, when reviewed in the light most favorable to the government with all reasonable inferences and credibility choices made in support of a conviction, allows a rational fact finder to find every element of the offense beyond a reasonable doubt.'" Id. (quoting United States v. Asibor, 109 F.3d 1023, 1030 (5th Cir. 1997)). Thus, our inquiry is "limited to whether the jury's verdict was reasonable, not whether we believe it to be correct." United States v. Williams, 264 F.3d 561, 576 (5th Cir. 2001).

To establish a defendant's guilt for first degree murder under 18 U.S.C. § 1111, the Government must prove that a defendant: (1) unlawfully killed another person; (2) with malice aforethought; and (3) premeditation. United States v. Agofsky, 458 F.3d 369, 371 (5th Cir. 2006). Moreover, anyone who "aids, abets, counsels, commands, induces or procures [the murder], is punishable as a principal." 18 U.S.C. § 2. "An aider and abettor is liable for criminal acts that are the 'natural or probable consequence of the crime' that he counseled, commanded or otherwise encouraged." United States v. Vaden, 912 F.2d 780, 783 (5th Cir. 1990) (citations omitted).

To sustain a conviction for aiding and abetting, the Government must prove that the underlying offense occurred, "that [the] defendant associated with [the] criminal venture, purposefully participated in the criminal activity, and sought by his or her actions to make the venture succeed." United States v. Polk, 56 F.3d 613, 620 (5th Cir. 1995) (citations omitted). A defendant associates himself with a criminal venture when he shares in the criminal intent of the principal. United States v. Jaramillo, 42 F.3d 920, 923 (5th Cir. 1995). "To

participate in the criminal activity means that the defendant acted in some affirmative manner designed to aid the venture." Id. (citation omitted).

We find that there is sufficient evidence to uphold a conviction for aiding and abetting Brown's murder under 18 U.S.C. § 2. A rational jury could have concluded that Brown intended to join in Jackson's criminal venture because there was evidence he: (1) drew a deadly weapon against Brown in response to Jackson's instructions to do so; and (2) joined in chasing Brown for approximately sixty yards into cell number 125. Indeed, the video evidence shows that Gulley, weapon in hand, was the first person to corner Jackson in the cell. It does not matter whether Gulley struck the mortal blow because he participated in the chase and encouraged the fight. See United States v. Villarreal, 963 F.2d 725, 730-31 (5th Cir. 1992) (upholding an aiding and abetting murder conviction where the defendant's fight with a police officer ended when his co-defendant shot the officer). Moreover, a rational jury could conclude that Gulley intended for his actions to assist in the murder of Brown. Inmate Prince testified that upon running into cell number 125, Gulley told him and Richards "we're going to kill this nigger, get out of here." This is direct evidence of intent, and the jury was entitled to credit the testimony as they saw fit. See United States v. Cathey, 259 F.3d 365, 368 (5th Cir. 2001).

Gulley's seeks to avoid this conclusion by analogizing his case to the Eighth Circuit's decision in United States v. Grey Bear, 828 F.2d 1286 (8th Cir. 1987). In that case, eleven co-defendants were brought to trial and variously convicted of first-degree murder, second-degree murder, and assault resulting in serious bodily injury. Id. at 1288. The evidence established that the defendants attacked the victim at a party, chased him to a highway, beat him, and left him lying on a road. Id. at 1293-97. One of the defendants then drove over the victim. Id. at 1294. The court found that there was insufficient evidence to support a conviction against co-defendant Maynard Dunn for assault

resulting in serious bodily injury because the only evidence implicating him was a single witness's testimony that Dunn "threw a punch" at the victim. Id. at 1295. There was no evidence to show when Dunn threw the punch, where on the victim's body it landed, or what type of injury it caused. Id. Furthermore, while Dunn could have aided and abetted the crime of assault by implicitly encouraging others to engage in their more severe attack on the victim, the Government's own witness testified that Dunn had stated he did not want to get involved in the fight. Id.

Gulley's reliance on Grey Bear is unavailing. Unlike in Grey Bear, here there is no ambiguity in the time line or any question that Gulley was involved in the ultimate events leading to the victim's death. Also, in Grey Bear, the prosecution's witness testified that the co-defendant expressly disavowed an intent to take part in the fight that caused the victim's death. But here the evidence shows that Gulley fully participated in the events leading up to Brown's death and expressed an intent to kill Brown. Thus, Gulley was not convicted based on his "mere presence at the scene of the crime." See id. at 1292 (citation omitted). Gulley was convicted because he drew a weapon in response to Jackson's exhortation to "get" Brown, chased Brown into cell number 125, where the fatal blow was struck, and told Prince he was going to kill Brown seconds before Brown was in fact killed.

B. Character Evidence

Gulley argues that the district court erred by excluding proof of eight prior instances of violence committed by Brown because such evidence tended to prove that Brown was the first aggressor. Gulley points out that in order to prove that he acted in self defense, he was required to show that he was neither the first aggressor nor otherwise at fault for inciting the fatal attack. He contends, therefore, that evidence of Brown's prior violent acts were admissible under Rule 405(b) of the Federal Rules of Evidence to show that Brown was more likely than

11

not the first aggressor. Moreover, Gulley asserts that the exclusion of the evidence was harmful to his case because there were no cameras that captured the events in the compound precipitating the fight. The Government was able to show video evidence of Gulley chasing Brown, but Gulley was allegedly precluded from offering evidence justifying his conduct.

We review a district court's decision to exclude character evidence for an abuse of discretion. United States v. Marrero, 904 F.2d 251, 260 (5th Cir. 1990) (citation omitted). In general, "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion . . . ." FED. R. EVID. 404(a). However, evidence of a "pertinent" character trait of the victim may be introduced. FED. R. EVID. 404(a)(2). Rule 405 establishes the permissible methods of proving character:

> (a) Reputation or Opinion. In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct.
>
> (b) Specific instances of conduct. In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of that person's conduct.

FED. R. EVID. 405. Rule 405(b) thus limits the use of specific prior acts to cases where character is at issue "in the strict sense" because that method of proof "possess the greatest capacity to arouse prejudice, to confuse, to surprise, and to consume time." Rule 405 advisory comm. notes.

Gulley argues that character was an essential element at issue in this case because Brown's propensity for violence tends to indicate that he was the first

aggressor. In support, he relies upon United States v. Burks, 470 F.2d 432, 434 (D.C. Cir. 1972), where the D.C. Circuit held that "evidence of the deceased's violent character, including evidence of specific violent acts, is admissible where a claim of self-defense is raised." The court reasoned that "[s]uch evidence is relevant on the issue of who was the first aggressor . . . ." Id. Moreover, the court noted that it is irrelevant whether the defendant knew of the prior violent acts "for the question is what the deceased probably did, not what the defendant probably thought the deceased was going to do." Id. at 434 n.4 (internal quotation marks and citations omitted).

Other circuit courts have disagreed with the D.C. Circuit. In United States v. Gregg, 451 F.3d 930, 934 (8th Cir. 2006) (citation omitted), the Eighth Circuit acknowledged that a defendant can introduce evidence of a victims's violent character to establish conformity therewith when self defense is raised, but held that such evidence is limited to reputation or opinion evidence because "a victim's violent character is not an essential element of . . . the defense of self-defense." The court reasoned that character evidence in the self-defense context is circumstantial evidence and, therefore, may not be proven by prior specific acts. Id. (citation omitted). The Eighth Circuit refrained from following the D.C. Circuit's decision in Burks because that case was decided before the Federal Rules of Evidence were adopted. Id. at n.5.

In United States v. Keiser, 57 F.3d 847, 854-55 (9th Cir. 1995), the Ninth Circuit held that "[u]nder the Federal Rules of Evidence, only reputation or opinion evidence is proper to show that the victim of an assault had a propensity toward violence." Id. at 855. The court stated that "[t]he language of the rule states in straightforward manner that evidence of specific instances of conduct may only be made when a person's character is 'an essential element of a . . . defense.'" Id. (citation omitted). And it concluded that a victim's character is not an essential element of self-defense. Id. at 857. The court reasoned that a

13

defendant could prove that a victim had a violent character and in fact attacked the defendant, but still fail in a self defense claim if he used more force than appeared reasonably necessary. Id. On the other hand, it noted, a defendant could prevail in his "claim of self-defense against an avowed pacifist, so long as the jury agrees that the defendant reasonably believed unlawful force was about to be used against him." Id.

Finally, in United States v. Smith, 230 F.3d 300, 308 (7th Cir. 2000), the Seventh Circuit stated that specific-acts character evidence is usually not admissible to prove a propensity for violence. The Seventh Circuit chose not to adopt the Ninth Circuit's rationale in Keiser because specific acts of conduct known to the defendant might factor into the defendant's decision to act in self defense. Id. at 308 n.5. In such instances the defendant should be able to introduce specific acts to prove his subjective belief.[1] Id. 308 & n.5. Nevertheless, the court concluded that when prior violent acts are unknown to the individual claiming self defense, they are necessarily circumstantial in nature and cannot be admitted. Id. at 308.

We find that Brown's prior specific acts were not admissible to prove his alleged propensity for violence. First, as recognized by the Seventh, Eighth, and Ninth Circuits, the plain language of Rule 405(b) limits the use of specific instances of conduct to prove essential elements of a charge or defense. See FED. R. EVID. 405(b); see also Marrero, 904 F.2d at 260 (holding that specific instances

---

[1] This distinction was actually acknowledged by the Ninth Circuit in Keiser, where the Ninth Circuit stated that "we need not, and do not, reach the question whether specific acts are admissible to bolster the assertion that the defendant's belief in the need for force was reasonable." 57 F.3d at 853. In any event, it is not relevant to this case because Gulley does not argue that Brown's prior violent acts were known to him or that they were relevant to his state of mind. He is simply trying to prove that Brown's prior violent acts make it more likely than not that Brown was the first aggressor.

of conduct are not admissible as circumstantial evidence proving lack of intent). Second, Brown's character was not an essential element of the self defense claim in the "strict sense" because a self defense claim may be proven regardless of whether the victim has a violent or passive character. See Keiser, 57 F.3d at 857. Finally, the D.C. Circuit's decision in Burks is inapposite because it was promulgated before the Federal Rules of Evidence were adopted. Although well-reasoned, it does not comport with the subsequently adopted language of Rule 405(b) itself.[2]

## C. Prosecutorial Delay

Gulley argues that it was reversible error for the district court to refuse to permit discovery into the Government's reasons for delay in filing the indictment. He asserts that the district court should have held some type of hearing, in camera or otherwise, to determine what the Government's motives were because a defendant cannot bear the heavy burden of proving bad faith without discovery. Gulley does not contend that there was sufficient evidence of prejudice. Rather, he argues that by preventing him from inquiring into the prosecutor's decisionmaking process, the district court also prevented him from ascertaining the advantage the Government gained.

In United States v. Crouch, 84 F.3d 1497, 1514 (5th Cir. 1996) (en banc), this court held that "for preindictment delay to violate the due process clause it

---

[2] Even were we to find that the district court had erred we would not reverse because excluding the evidence was harmless. See United States v. Sumlin, 489 F.3d 683, 688 (5th Cir. 2007) (citation omitted). This court will not overturn a conviction based on the exclusion of evidence unless a reasonable probability exists that the error contributed to conviction. Id. (citations omitted). Here, even if Brown was the initial aggressor, the evidence was sufficient to prove that Brown sought to withdraw from the attack and he did not pose an immediate threat to Gulley. See United States v. Goodface, 835 F.2d 1233, 1235-36 (8th Cir. 1987) (holding that self defense instruction was not warranted where the defendant's actions indicated he failed to withdraw from a conflict when he could have done so safely).

must not only cause the accused substantial, actual prejudice, but the delay must also have been intentionally undertaken by the government for the purpose of gaining some tactical advantage over the accused in the contemplated prosecution or for some other impermissible, bad faith purpose." An "[i]ntentional delay for the purpose of gaining tactical advantage would include delay for the purpose of rendering unavailable evidence favorable to the defense or which would tend to undercut the government's case." Id. at 1514 n.23. To establish prejudice, the defendant must offer more than mere speculation of lost witnesses, faded memories or misplaced documents; he must show an actual loss of evidence that would have aided the defense and that cannot be obtained from other sources. Id. at 1515 (citations and quotations omitted). The burden is on the defendant to prove both prongs of the test. United States v. Avants, 367 F.3d 433, 441 (5th Cir. 2004) (citations omitted) (noting that this court does not follow the minority view that once actual prejudice is shown the district court should balance prejudice against the Government's justification for delay). We review the district court's factual determinations when reviewing a motion to dismiss for pre-indictment delay for clear error; legal conclusions are reviewed de novo. Id. (citation omitted).

In this case, we find no reversible error in the district court's decision to refuse to hold an in camera hearing. Crouch advised district courts that "at least in all but the very clearest and most compelling cases, the district court . . . should carry [a motion to dismiss for pre-indictment delay] with the case, and make the determination of whether actual, substantial prejudice resulted from the improper delay in light of what actually transpired at trial." Id. at 1516. This court has subsequently determined that even when a district court makes a pre-trial finding that the prosecution's delay caused actual prejudice, it is not under an obligation to permit discovery or hold an open hearing. United States

16

v. Mulderig, 120 F.3d 534, 540 (5th Cir. 1997). In this case, there was no reason to hold any hearing because the district court found that Gulley suffered no prejudice from the delay. Thus, even if discovery might have shown that the Government sought to gain a tactical advantage by delaying the prosecution, Gulley would not be entitled to a reversal because he had to prove bad faith and prejudice. See Avants, 367 F.3d at 441 (citations omitted). Gulley seeks to avoid this argument by collapsing the two-prong standard into one test, arguing that he cannot prove prejudice until he can discover why the prosecution was delayed. But our case law is clear that each element is separate and distinct. See id. at 441-42.

D. Ineffective Assistance of Counsel

Gulley argues that he received ineffective assistance of counsel because his attorneys did not adequately prepare Gulley's crime-scene-reconstruction expert, Henderson. In particular, Gulley notes that his counsel provided Henderson with electronic copies of the surveillance videos, but Henderson was unable to access them on his computer. Moreover, it is undisputed that if trial counsel had rectified this problem when notified, Henderson would have opined that Jackson struck the mortal blow that killed Brown. Gulley contends, therefore, that but for his counsels' error, the jury would have had concrete scientific evidence proving that Jackson was the killer. In response, the Government argues that this court should not reach the issue on direct appeal because the question was not raised before the district court. In the event that this court does reach the issue, however, the Government contends that Gulley cannot prove any prejudice because the prosecution argued in its closing argument that Gulley aided and abetted Jackson's murder of Brown.

A defendant's Sixth Amendment right to counsel is violated if: (1) his counsel's performance was deficient; and (2) the deficient performance

prejudiced his defense.  Strickland v. Washington, 466 U.S. 668, 687 (1984); Bower v. Quarterman, 497 F.3d 459, 466 (5th Cir. 2007) (citation omitted).  An attorney's performance was deficient if it fell below an objective standard of reasonableness.  Bower, 497 F.3d at 466 (citation omitted).  "[T]o prove prejudice, 'the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"  United States v. Conley, 349 F.3d 837, 841 (5th Cir. 2003) (citation omitted).  "If proof of one element is lacking, the court need not examine the other."  Kirkpatrick v. Blackburn, 777 F.2d 272, 285 (5th Cir. 1985) (citation omitted).

However, the "general rule in this circuit is that a claim of ineffective assistance of counsel cannot be resolved on direct appeal when the claim has not been raised before the district court since no opportunity existed to develop the record on the merits of the allegations."  United States v. Higdon, 832 F.2d 312, 313-14 (5th Cir. 1987) (citations omitted).  Only in those rare occasions where the record is sufficiently developed will the court undertake to consider claims of inadequate representation on direct appeal.  Id. at 314 (citations omitted).  If we cannot fairly evaluate the claim from the record, we must decline to consider the issue without prejudice to a defendant's right to raise it in a subsequent proceeding.  See id.; United States v. Villegas-Rodriguez, 171 F.3d 224, 230 (5th Cir. 1999) (stating that ordinarily the proper mechanism for resolving an ineffective assistance of counsel claim is a habeas corpus proceeding).

We agree with the Government that Gulley's claim is not ripe for review because "the district court did not hold a hearing and the record does not provide sufficient detail about trial counsel's conduct and motivations to allow this court to make a fair evaluation of the merits of [the defendant's] claim."  United States

v. Aguilar, 503 F.3d 431, 436 (5th Cir. 2007). This is not a case where the court can simply find as a matter of law that defense counsel did not err. See, e.g., Villegas-Rodriguez, 171 F.3d at 230 (rejecting the defendant's ineffective assistance argument on direct appeal because counsel had no legal basis to object to the testimony defendant complained of). Indeed, Gulley's counsel originally intended for Henderson to review the crime scene videos, but for whatever reason did not respond to Henderson's problems accessing the video that was provided. We can only speculate as to why. See Higdon, 832 F.2d at 314 (declining to decide an ineffective assistance claim because the court could only speculate what the attorney's motivations were). On the other hand, it is unclear whether Henderson's testimony would have had any effect on the outcome of the case because nearly all of the evidence already supported the conclusion that Gulley did not strike the killing blow. Accordingly, we decline to consider this issue at this time, but do so without prejudice to Gulley's right to raise it in a habeas corpus proceeding.

E. Right to be Present at Trial

Gulley argues that he was not present when a jury note—requesting leave to "recess for the day in order to collect thoughts and reflect on all points made about the case"—was read. He asserts that there is no notation of his presence in the trial record, although the balance of the transcripts otherwise indicate that he was, in fact, present. While his counsel were present and did object to the district court's proposal to instruct the jury to deliberate until 5:00 p.m., defense counsel agreed to the district court's order directing the jury to deliberate until 4:00 p.m. Gulley argues that if he were present when the jury note was read he would have insisted that counsel object. He contends that the error was not harmless because it is clear that there was one holdout on the jury, and the district court's order had a coercive effect on that juror.

Under Rule 43 of the Federal Rules of Criminal Procedure, a criminal defendant has the right to be present at every stage of the trial, including when a judge is determining how to respond to a question from the jury. See FED. R. CRIM. P. 43(a); United States v. Brooks, 786 F.2d 638, 643 (5th Cir. 1986). Although a district court may "technically" violate a defendant's right to be present at every stage of a trial, the violation only requires reversal if it prejudiced the defendant. United States v. Hagmann, 950 F.2d 175, 179 (5th Cir. 1991) (citations omitted). We therefore review an alleged violation of Rule 43 for abuse of discretion and harmless error. Id. (citations omitted) (finding no prejudice from an ex parte communication where the defendant's counsel earlier failed to object to the district court's anticipatory ruling on the same issue); United States v. Breedlove, 576 F.2d 57, 59-60 (5th Cir. 1978) (holding that if the district court's answer to the jury's inquiry is distinctly responsive to a question and clearly states the law, and if no prejudice is shown, the violation of Rule 43 is harmless).

Assuming that Gulley was not present when the district court responded to the jury's request to recess, we find that the error was harmless. The presence of Gulley's defense counsel and their objection to the district court's original response tends to mitigate any potential prejudice that might have occurred in Gulley's absence. See United States v. Stratton, 649 F.2d 1066, 1080 (5th Cir. Unit A July 1981) (citations omitted). Furthermore, there is no evidence in the record that any holdout jury member ever existed. Nor is there any other reason to believe that the district court's instruction to the jury to deliberate for approximately thirty additional minutes influenced the jury's decision or coerced the jury into rendering a verdict. Cf. United States v. Cowan, 819 F.2d 89, 91 (5th Cir. 1987) (reversing the defendant's convictions where the trial judge met ex parte with each juror to discuss the jury's obligation to reach

a verdict). To the contrary, the jury did not return the verdict until the next morning, after the jury had recessed for the night. See United States v. Roberts, 913 F.2d 211, 216-17 (5th Cir. 1990) (holding that a delay between an ex parte communication and the jury's verdict is evidence that the communication was not coercive). Accordingly, Gulley's absence did not result in any demonstrable prejudice and was harmless error.

## III. CONCLUSION

For the reasons stated above, we AFFIRM Gulley's conviction and sentence.