# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 15, 2010

No. 09-60400

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

TORENDA WHITMORE, also known as Torenda Brooks, also known as Tory; EDDIE JAMES PUGH, IV, also known as Stretch; BARRON LECOUR BORDEN, also known as Bam,

Defendants - Appellants

Appeals from the United States District Court
for the Southern District of Mississippi
No. 1:08-CR-130-3

Before JONES, Chief Judge, and KING and HAYNES, Circuit Judges.

HAYNES, Circuit Judge:[*]

Appellants Torenda Whitmore, Eddie Pugh, and Barron Borden were charged and convicted under a seven count indictment for the kidnapping and murder of Byron McCoy and the kidnapping and serious injury of Rahaman

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 09-60400

Mogilles.[1]  They now appeal, raising numerous challenges to their convictions
and sentences.  We AFFIRM.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Viewed in the light most favorable to the verdict, the record establishes
the following facts.  On October 8, 2008, Mogilles and McCoy went to Pugh's New
Orleans home to purchase marijuana.  Pugh shared the home with his mother
and his girlfriend, Whitmore.  Mogilles and McCoy had come by earlier in the
day, but Pugh turned them away after telling Mogilles that he feared McCoy was
a police officer.  Upon returning to Pugh's house to again attempt to purchase
drugs, Mogilles entered with Pugh while McCoy stayed in Mogilles's SUV out
front.

Mogilles walked onto the back patio to smoke when he saw Borden arrive
carrying a bag with what appeared to be a baseball bat hanging out of it.
Moments later, Mogilles was struck in the head and knocked unconscious.
Whitmore later told police she observed Mogilles lying on the patio pleading
after he was assaulted.  As Mogilles lay stunned, Pugh motioned for McCoy to
come inside.  McCoy entered unaware of the assault on Mogilles, and Pugh
punched him and pulled his pants down to incapacitate him.  McCoy was then
subdued by one or more blows to the head.

Pugh and Borden bound both McCoy and Mogilles with telephone wire and
loaded them into Mogilles's SUV.  Mogilles testified that Whitmore saw him as
he was dragged to the car, and she stated in response, "That's f'd up."  Mogilles
and McCoy, both still bound, were placed in the middle seat, with McCoy seated
behind the driver.  Borden sat in the rear with a .40 caliber SigArms pistol
pointed at McCoy's head.  Upon leaving, Whitmore followed the SUV in a silver
Scion that was parked in front of the house.  Pugh drove the SUV to Mississippi

---

[1] The specific charges against each defendant-appellant set forth below.

while Borden kept the pistol pointed at McCoy's head.  After crossing the state border, Whitmore needed fuel and signaled to the SUV to pull over to stop for gas.  Both cars exited the interstate, Whitmore filled her vehicle, and they both continued to the murder scene.

After entering Jackson County, Mississippi, Pugh exited the interstate and traveled a few miles north to Larue Street.  He then pulled the SUV off to the side of the road.  The Scion stopped behind the SUV.  At this time, Borden shot McCoy in the head.  Mogilles broke free from his restraints.  After a scuffle, Mogilles ran into a nearby briar patch.  Pugh fired after him, wounding him twice.

After escaping, Mogilles observed Whitmore circling the Scion around the block and "looking around."  After avoiding Whitmore, Mogilles flagged down a school bus for help.  Simultaneously, Elliot Jones, a high school student who was driving by the area, contacted police to report observing three black males near an SUV on Larue Road, one of whom was running into the woods while another shot at him.  Jones also reported seeing a silver Scion behind the SUV.

After Mogilles escaped, Pugh and Borden drove the SUV down a dirt road and abandoned it.  Pugh poured gasoline inside the vehicle and set it on fire with McCoy's body still inside, burning himself in the process.  He and Borden then fled through the woods.  As they ran, they discarded their phones, keys, and the murder weapon.  They were apprehended under a nearby bridge.

Whitmore was stopped soon thereafter when Jones returned to the scene and alerted police to her vehicle.  Jones confirmed it was the vehicle he had seen near the SUV. Jackson County Sheriff's Deputy Tyrone Nelson  approached the car and questioned Whitmore.  According to Nelson, Whitmore stated that she was merely lost and kept looking over at the SUV.  Based on the reports regarding the Scion, Whitmore was detained for questioning at the police station.  Once there, Whitmore was interviewed by FBI Special Agent Jerome

No. 09-60400

Lorrain. Whitmore denied knowing Pugh, Borden, or the victims. Further, she claimed she was on her way to Montgomery, Alabama, and had gotten lost. Whitmore later recanted and admitted to having been present at Pugh's house when Mogilles came by to purchase drugs. Further, she admitted seeing Mogilles disabled on the back patio pleading and that she knew a confrontation had occurred with McCoy. Whitmore then admitted she followed Pugh and Borden to the murder scene.

All three defendants were charged with conspiracy to kidnap, kidnapping that resulted in the murder of McCoy, and kidnapping that resulted in the injury of Mogilles. Pugh was charged with being a felon in possession of a firearm and using a firearm during a crime of violence. Borden was also charged with being a felon in possession of a firearm and using a firearm during a crime of violence

The government presented Mogilles's testimony, Jones's testimony, the police officers' investigation of the crime scene, Pugh's post-arrest statements, Whitmore's post-arrest statements, the blood found at Pugh's home, Borden's burn wounds, and other evidence. Neither Pugh nor Whitmore presented any evidence. Borden called three witnesses. The jury convicted Pugh and Borden on all counts. The jury convicted Whitmore on both kidnapping charges on a theory of aiding and abetting, but acquitted on the conspiracy charge.

Whitmore was sentenced to life in prison to be followed by five years of supervised release. Pugh was given a life sentence plus five additional years plus three years of supervised release. Borden was also given a life sentence plus five additional years plus five years of supervised release. Appellants timely appealed.

## II. DISCUSSION

Appellants appeal their convictions and sentences on a variety of grounds.

4

No. 09-60400

## A. *Denial of Appellants' Motion to Sever*

Appellants claim the district court erred in denying their motion to sever. The court reviews the denial of severance for abuse of discretion. *United States v. Mitchell*, 484 F.3d 762, 775 (5th Cir. 2007). To demonstrate an abuse of discretion in denying the motion for severance, the defendant must show specific and compelling prejudice that resulted in an unfair trial, and such prejudice must be of a type against which the trial court was unable to afford protection. *Id*. Appellants moved to sever based on their inability to challenge incriminating statements made by their co-defendants. Yet, at trial, the government did not use any of Appellants' words, testimony, or statements against the other appellants. Instead, the government only introduced statements by Whitmore that inculpated Whitmore, statements by Pugh that inculpated Pugh, and the government did not enter any statements made by Borden. Neither Borden nor Pugh[2] identify any of their respective co-defendants' statements that incriminate them in the crime.[3] Further, the government offered substantial additional evidence of guilt as to each defendant, including Mogilles's and Jones's eyewitness testimony as well as evidence found in Pugh's home and the SUV. Finally, the district court properly included limiting instructions from the Fifth Circuit Pattern Jury Instructions so as to prevent any undue prejudice. As such, the district court did not abuse its discretion when it denied Appellants' motion to sever.

## B. *Denial of Appellants' Motion for Change of Venue*

Appellants next assert that the district court erred in denying their motion for a change of venue due to media coverage of the crime. Specifically,

---

[2] Whitmore offers no argument on this claim of error. Instead, she advances this claim by way of incorporation under Federal Rule of Appellate Procedure 28(i).

[3] The allegedly incriminatory information Pugh cites in his briefing was neither directly incriminatory nor exclusively presented through Whitmore's statements.

No. 09-60400

Appellants argue that a single news story carried on the front-page of one Gulf Coast newspaper and dissemination of the story via "electronic media" was sufficient to warrant change of venue for their federal trial. We review a district court's denial of a motion for change of venue for abuse of discretion. *United States v. Parker*, 877 F.2d 327, 330 (5th Cir. 1989). "[T]he district court must grant a change of venue when it is satisfied that there exists in the district where the prosecution is pending so great a prejudice against the defendant [that he] cannot obtain a fair and impartial trial." *Id.* (second alteration in original) (internal quotation marks and citations omitted). However, "a change of venue should not be granted on the mere showing of widespread publicity." *Id.* Appellants' have failed to demonstrate how the limited media coverage cited in Borden's briefing "was in excess of the sensationalism inherent in the crime or that pervasive community prejudice resulted from the publicity." *Id.* at 331. Accordingly, the district court did not abuse its discretion in denying the motion for change of venue.

## C. *Denial of Appellants' Motions to Suppress*

Appellants claim the district court erroneously denied their individual motions to suppress each of their post-arrest statements. Pugh also argues the district court erred in denying his additional motion to suppress the evidence gained from the search of his residence and the medical examination of his body conducted after his arrest. In reviewing a suppression ruling, we examine factual findings for clear error and legal conclusions de novo. *United States v. Cavazos*, 288 F.3d 706, 709 (5th Cir. 2002). We "view the evidence in the light most favorable to the party that prevailed in the district court, considering the evidence offered at the suppression hearing as well as the evidence admitted at trial." *United States v. Gonzales*, 121 F.3d 928, 938 (5th Cir. 1997). The district court's denial of the motion to suppress is subject to a harmless error analysis. *See United States v. Garcia-Ruiz*, 546 F.3d 716, 718 (5th Cir. 2008).

No. 09-60400

1. The Admission of Appellants' Post-Arrest Statements

a. Whitmore's Statements

Whitmore challenges the trial court's refusal to suppress her post-arrest statements, arguing the police lacked probable cause to arrest her when she was detained near the scene of the murder. "Probable cause exists when the totality of facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *United States v. Nunez-Sanchez*, 478 F.3d 663, 666 (5th Cir. 2007) (internal quotation marks omitted). The arresting officers had sufficient information under the totality of the circumstances to create probable cause for her arrest. Police had numerous reports that a silver Scion like the one Whitmore was driving had been following the burnt SUV, and Whitmore was found near the scene of the crime. She also acted suspiciously when stopped and questioned by officers.[4] Consequently, Whitmore's arrest was not unlawful, and the district court did not err in denying her motion to suppress.

b. Pugh's Statements

Pugh argues that the district court erroneously failed to suppress his post-arrest statements for four reasons: (1) the federal officers violated his Sixth Amendment rights by questioning him after he asked for a lawyer; (2) the federal officers did not present him in a timely fashion to a judicial officer; (3) the federal officers used appeals to religion to secure a confession; and (4) the totality of the circumstances justified suppression.

---

[4] Whitmore makes much of the fact that one of the on-scene officers testified that he did not believe the police had probable cause to arrest her. Nonetheless, we have previously held that "the mere subjective sentiment of the arresting officer or person" is not dispositive in determining the legality of an arrest. *United States v. Sealed Juvenile 1*, 255 F.3d 213, 219 (5th Cir. 2001).

7

No. 09-60400

First, Pugh claims that his oblique statements to officers suggesting he desired counsel were sufficient to trigger his Sixth Amendment rights. Specifically, Pugh argues that he invoked his right to counsel by asking "how he could go about getting a court appointed attorney . . . ." Pugh's argument is unavailing. Under *Miranda*, a "suspect must unambiguously request counsel." *Davis v. United States*, 512 U.S. 452, 459 (1994); *see also Berghuis v. Thompkins*, No. 08-1470, 2010 U.S. LEXIS 4379, at *19-20 (June 1, 2010) (reaffirming that a suspect must "unambiguously" invoke the *Miranda* right to counsel and extending that principle to the *Miranda* right to remain silent). Consequently, the district court did not err in refusing to suppress Pugh's statements as he did not unequivocally invoke his Sixth Amendment right to counsel.

Next, Pugh claims the district court was obliged to suppress his statements because he was not timely presented before a judicial officer. In total, Pugh was held in custody for six days before appearing before a federal magistrate judge. The Supreme Court has held that post-arrest statements obtained outside the six-hour safe harbor created by 18 U.S.C. § 3501(c) should be suppressed where the delay was unreasonable or unnecessary. *Corley v. United States*, 129 S. Ct. 1558, 1571 (2009). However, this obligation does not arise until a defendant is subject to a *federal* arrest. "Until a person is arrested or detained for a federal crime, there is no duty, obligation, or reason to bring him before a judicial officer 'empowered to commit persons charged with offenses against the laws of the United States . . . .'" *United States v. Alvarez-Sanchez*, 511 U.S. 350, 358 (1994). Pugh was arrested by state officers for a state offense. Further, Pugh has not offered any evidence to suggest state officials acted in collusion with federal officials with an aim of depriving him of the right of timely presentment. As such, Pugh has not demonstrated that he was deprived of his right to timely presentment on the federal charges at issue.

8

Third, Pugh claims that his statements should have been suppressed because the interrogating officers made appeals to his religious beliefs. But an interrogating officer's mere reference to religious beliefs does not alone invalidate a confession. Pugh's reliance on *Brewer v. Williams*, 430 U.S. 387 (1977), to claim otherwise is misplaced. *Brewer*, as recognized by this court in *United States v. Dougall*, 919 F.2d 932 (5th Cir. 1990), concerned the use of religious beliefs to disregard a defendant's invocation of his right to counsel. *Brewer*, 430 U.S. at 400-01 (discussing the "Christian burial speech" as a surreptitious interrogation). Pugh never invoked his right to counsel and all available evidence suggests his statements were voluntarily given. As such, the officers' appeals to religious beliefs do not render his statements inadmissible.

Finally, Pugh claims the totality of the circumstances surrounding his interrogation require suppression of his statements. None of the evidence cited by Pugh suggests officers employed coercion so as to make Pugh's statements involuntary. As such, the district court did not err in denying Pugh's motion to suppress his post-arrest statements.

### c. Borden's Statements

Borden also claims that his statements to police after his arrest should have been suppressed because he never waived his *Miranda* rights. The government does not dispute that Borden's statements were inadmissible. Instead, it argues Borden's claim is meritless because Borden's post-arrest statements were never admitted at trial. We agree. Even assuming the district court erred in denying Borden's motion, any resulting error was rendered harmless by the fact that the evidence Borden sought to have suppressed was never introduced. Because the alleged error was harmless, Borden is not entitled to relief.

2. The Admission of Evidence Taken from Pugh's Home

No evidence in the record supports Pugh's contention that his home was searched before police obtained a warrant. While the record shows that the New Orleans Crime Lab was "requested" to conduct a search roughly two hours before a warrant issued, nothing suggests the search itself was conducted at that time. Additionally, the responsible FBI agent affirmatively testified that the search did not begin until after the warrant was signed. Accordingly, Pugh was not entitled to suppress the evidence obtained from the search of his residence.

3. The Admission of Evidence Regarding Pugh's Medical Examination

Pugh also claims the trial court erred in refusing to suppress the results of a medical examination conducted after his arrest. The examination was introduced as evidence confirming he had suffered burns and linking him to the destruction of the SUV and McCoy's body. The mere lack of consent to treatment by a suspect in custody does not, by itself, mandate exclusion, and Pugh's attempt to invoke the Fourth Amendment protection against bodily intrusions to exclude this evidence is unavailing. Pugh's cited authority—*Winston v. Lee*, 470 U.S. 753 (1985)—only concerned intrusions into the body and the concomitant possibility for dignitary and privacy-related harms. Here, the disputed evidence consisted of nothing more than a doctor's observations of burns on the surface of Pugh's body. Consequently, the district court properly refused to suppress the evidence of Pugh's medical examination.

D. *The Trial Court's Evidentiary Rulings*

Appellants individually and collectively assert three claims of error flowing from the district court's rulings on the evidence admitted at trial. "Generally, challenges to the admission of evidence at trial are reviewed by this court for an abuse of discretion, subject to harmless error analysis." *United States v. Stephens*, 571 F.3d 401, 409 (5th Cir. 2009) (internal quotation marks omitted).

1. The Admission of the 911 Tape

No. 09-60400

Appellants argue that the tape of a 911 call placed by a local firefighter based upon information received from two unidentified witnesses who did not testify at trial constituted impermissible double hearsay under Federal Rule of Evidence 805. At trial, the district court prohibited the firefighter from testifying as to the information provided by the unidentified witnesses on the grounds that the information provided by those individuals constituted hearsay. Whitmore argues that the same objection should have excluded the 911 tape as it contains the same inadmissible hearsay compounded by a second layer of hearsay.[5] Nonetheless, even assuming the district court erred, any resulting error was harmless. The 911 tape identifies the location where the SUV went off the road, states that a black male was seen in the vicinity, describes a silver Scion also in the area, and mentions reports of shots fired. All of this information was also admitted at trial through a number of other sources, including the testimony of Mogilles and Jones. Consequently, Appellants are not entitled to relief on these grounds.

2. The Admission of the Government's Expert Testimony

Maureen Bradley, a Ph.D. in analytical chemistry, offered testimony at trial linking paint chips found at the murder scene to the burned SUV found some distance away. Appellants contend the district court erred in admitting Bradley's testimony on the grounds that there were no studies that established the error rate for paint chip matching, Bradley kept no database of paint chip comparisons, and Bradley kept no statistics on the success and error rates of her paint chip comparisons. In short, Appellants contend Bradley's testimony was

---

[5] Appellants' subsidiary argument that the admission of the 911 tape violated the Confrontation Clause is foreclosed by Supreme Court precedent designating the information contained in the tapes as "nontestimonial." *See Davis v. Washington*, 547 U.S. 813, 822 (2006) ("[S]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.").

compromised by the fact that she could not satisfy one of the *Daubert*[6] factors—establishing an error rate for the applied methodology. Yet, the government was not required to satisfy every *Daubert* factor. *See United States v. Norris*, 217 F.3d 262, 269 (5th Cir. 2000) ("*Daubert* makes clear that these four factors are non-exclusive and do not constitute a definitive checklist or test." (internal quotation marks and citations omitted)). Bradley had testified before as an expert witness on the same subject matter. She described the development of a recognized methodology for comparing paint chips and the scientific literature associated with the field. Her results were peer-reviewed. Finally, Pugh's cross-examination made the jury aware of the potential error rate issue underlying Bradley's testimony. As such, the district court did not abuse its discretion in admitting Bradley's testimony.

### 3. Rule 403 Objections to the Admission of Photos of McCoy

Appellants contend the court erred by failing to exclude numerous photos of McCoy's burnt body under Federal Rule of Evidence 403. Specifically, Appellants claim the admission of several photos of McCoy's burnt and bloody hands and back, McCoy's body, and McCoy's head resulted in unfair prejudice at trial. Under Rule 403, a district court is only required to exclude evidence if its prejudicial effect substantially outweighs its probative value. *See United States v. Fields*, 483 F.3d 313, 354 (5th Cir. 2007); *see also* FED. R. EVID. 403. "[W]e will not lightly second-guess a district court's decision to admit relevant evidence over a Rule 403 objection. . . . Thus, a district court's decision on Rule 403 grounds is disturbed 'rarely' and only when there has been 'a clear abuse of discretion.'" *Fields*, 483 F.3d at 354.

Though the disputed photos are admittedly gruesome, the district court's decision to permit their introduction does not rise to the level a clear abuse of

---

[6] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

No. 09-60400

discretion. Appellants concede that at least some of the photos were necessary to support the testimony of the medical examiner. As such, the prejudicial impact of the introduction of additional photos was thereby diminished. Moreover, as the government argues, the photos were also probative of why the government was able to offer little in the way of physical evidence—it had been burned along with the body. The photos also corroborated Mogilles's testimony and provided evidence of how McCoy had been incapacitated before his death. Consequently, the district court did not clearly abuse its discretion when it concluded that the prejudice created by photos of McCoy's body did not substantially outweigh their probative value.

*E. Sufficiency of the Evidence*

Whitmore and Borden appeal the district court's denial of their motions for judgment of acquittal.[7] Where, as here, a sufficiency of the evidence argument is raised in a timely motion for judgment of acquittal, we "examin[e] the evidence and all reasonable inferences drawn therefrom in the light most favorable to the verdict, and ask[] whether a rational trier of fact could have found guilt beyond a reasonable doubt." *United States v. Garcia*, 567 F.3d 721, 731 (5th Cir.), *cert. denied sub nom. Arriaga-Guerrero v. United States*, 130 S. Ct. 303 (2009). "'[I]t is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt.'" *Id.* (quoting *United States v. Bell*, 678 F.2d 547, 549 (5th Cir. Unit B 1982) (en banc)). This standard applies regardless of whether the evidence is direct or circumstantial. *United States v. Mergerson*, 4 F.3d 337, 341 (5th Cir. 1993).

---

[7] Pugh has not raised any such claim on appeal. Consequently, any claim of error regarding sufficiency as to Pugh has been waived. *Askanase v. Fatjo*, 130 F.3d 657, 668 (5th Cir. 1997) ("All issues not briefed are waived.").

1. Whitmore

Whitmore was convicted of kidnapping resulting in death and kidnapping resulting in serious injury on a theory of aiding and abetting. Accordingly, the government was required to prove beyond a reasonable doubt that (1) the underlying offense occurred; (2) Whitmore knowingly associated with the criminal venture; (3) she purposefully participated in the criminal activity; and (4) she sought by her actions to make the criminal venture succeed. *United States v. Gulley*, 526 F.3d 809, 816 (5th Cir.), *cert. denied* 129 S. Ct. 159 (2008). Whitmore's only contention on appeal is that the government failed to provide evidence of any "interaction" between Whitmore and Pugh and Borden regarding the kidnappings.

Contrary to Whitmore's argument, the government presented sufficient evidence to permit a reasonable juror to conclude beyond a reasonable doubt she was aware of the kidnapping and voluntarily participated in the crime with an aim towards making the venture succeed. The evidence demonstrated that (1) Whitmore saw Mogilles lying on the patio of Pugh's home "pleading" after he had been assaulted; (2) Whitmore saw Mogilles being taken to the SUV;[8] (3) Whitmore followed the SUV to the scene of murder thereby allowing Pugh and Borden to abandon and burn the vehicle; (4) Whitmore exercised control over the SUV while in transit to the murder scene by making it stop while she purchasing gasoline for the Scion; (5) and Whitmore lied about knowing Pugh and Borden and why her Scion was in the area when confronted by police only to later admit that she had been present at the outset of the criminal venture. In response to this evidence, Whitmore cites *United States v. Barnett*, 197 F.3d

---

[8] Whitmore vigorously contended at oral argument that evidence in the record contradicts Mogilles's testimony on this point. Regardless, we cannot and will not usurp the role of the jury to make credibility determinations or weigh contradictory evidence. *Brennan's Inc. v. Dickie Brennan & Co.*, 376 F.3d 356, 362 (5th Cir. 2004) ("[T]he court may not make credibility determinations or weigh the evidence, as those are jury functions.").

138 (5th Cir. 1999), but in that case the defendant never knew of the specific underlying unlawful act. *Id*. at 146-47. Here, a reasonable juror could conclude beyond a reasonable doubt that Whitmore was aware of the kidnapping that began in her presence within her home, that her participation in the crime was purposeful, and she sought by her actions to make the criminal venture succeed. Consequently, while the evidence was not overwhelming, it was sufficient to support the jury's verdict. As such, the district court correctly denied Whitmore's motion for judgment of acquittal.

2. Borden

Borden contends that the district court erred in denying his motion for judgment of acquittal because (1) there was no proof he knew the unlawful purpose or object of the conspiracy and joined in it willfully; (2) there was no physical evidence that he held or fired the murder weapon during the kidnapping; and (3) the cumulative effect of the trial court's errors was to deprive of his right to a fair trial. All three claims lack merit, and the district court correctly denied Borden's motion for judgment of acquittal.

As to the first claim, Borden suggests the government was required to present direct evidence that he "knew the unlawful purpose" when he acted to kidnap McCoy and Mogilles with Pugh and Whitmore. We have previously held that "[d]irect evidence of a conspiracy is unnecessary; each element may be inferred from circumstantial evidence." *Mitchell*, 484 F.3d at 768-69 (internal quotation marks omitted). Moreover: "An agreement may be inferred from a 'concert of action.'" *Id*. at 769 (internal quotation marks omitted). Consequently, the evidence that Borden held the murder weapon to McCoy's head during the kidnapping was sufficient in itself to demonstrate an agreement to participate.

As to the second claim, Borden argues that the government failed to present evidence that Borden had gun powder residue on his hands or that his fingerprints were found on the murder weapon, thus the evidence did not

support the jury's finding that he used a firearm in the kidnapping. Yet Mogilles testified that he observed Borden with a handgun aimed at McCoy during the kidnapping. We find the jury was free to rely upon the testimony given at trial to conclude that Borden held the gun on the victims. *Garcia*, 567 F.3d at 731 ("'A jury is free to choose among reasonable constructions of the evidence.'" (quoting *Bell*, 678 F.2d at 549 )).

Finally, as to the cumulative errors claim, where we find no merit in any of a defendant's claims of error, his claim of cumulative error must also fail. *See United States v. Moye*, 951 F.2d 59, 63 n.7 (5th Cir. 1992). As such, the district court did not err in denying Borden's motion for judgment of acquittal.

## D. The Reasonableness of Appellants' Sentences

Whitmore and Borden[9] advance various procedural and substantive objections to their sentences. In *Gall v. United States*, 552 U.S. 38 (2007), the Supreme Court set out a bifurcated approach for conducting a sentencing review. An appellate court must first determine whether the district court committed any significant procedural error. *Id.* at 51. If there is no procedural error, we then "consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard" to the extent it has been raised by the appealing party. *Id.* The district court's interpretation or application of the Sentencing Guidelines is reviewed de novo, and its factual findings are reviewed for clear error. *United States v. Cisneros-Gutierrez*, 517 F.3d 751, 764 (5th Cir. 2008).

### 1. Whitmore

Whitmore's argument on appeal concerns only whether the district court committed a procedural error; she does not otherwise argue the substantive reasonableness of her sentence. Specifically, Whitmore contends the district

---

[9] Pugh does not assert any claims error regarding his sentence. As such, any challenge to the procedural computation or substantive reasonableness of his sentence has been waived. *See Askanase*, 130 F.3d at 668.

court erred (1) by accepting the pre-sentence report's ("PSR") recommendation of an offense level of 43 for the kidnapping resulting in McCoy's murder; and (2) by declining to designate her a "minimal participant" under U.S. Sentencing Guidelines Manual § 3B1.2.

Regarding the PSR recommendation, Whitmore claims that she should not have been subject to the higher penalty for kidnapping resulting in death because McCoy's murder was not reasonably foreseeable under the circumstances. As discussed above, several pieces of evidence demonstrated not only that Whitmore was an active participant in the kidnappings but, as is relevant to her sentence, that she was aware that a violent assault on Mogilles and McCoy initiated the kidnappings. She saw Mogilles on the ground pleading after having been hit over the head, and she saw both men dragged to the SUV. Though she may not have seen the murder weapon, the violence she observed before the kidnapping was sufficient to permit the district court to conclude that McCoy's murder and the injuries to Mogilles were reasonably foreseeable. Accordingly, the district court did not abuse its discretion by adopting the PSR's level 43 recommendation.

With respect to the "minimal participant" provision, Whitmore claims that she was entitled a sentence reduction because she did not commit any of the physical acts necessary to carry out the kidnappings or the subsequent murder and assault.[10] "Whether [a defendant] was a minor or minimal participant is a factual determination that we review for clear error." *United States v. Villanueva*, 408 F.3d 193, 203 (5th Cir. 2005). It is not enough that the evidence reflects that a defendant "[did] less than other participants; in order to qualify

---

[10] To the extent Whitmore argues in the alternative that the district court "failed to consider" her request to be treated as a "minimal participant," the district court clearly and directly considered and rejected Whitmore's request—a point even Whitmore concedes elsewhere in her brief.

as a minor participant, a defendant must have been peripheral to the advancement of the illicit activity." *Id.* at 204 (internal quotation marks omitted). Whitmore traveled from Louisiana to Mississippi following what the jury found she knew to be a kidnapping in progress. Her presence was needed to provide the "getaway car" and enable Pugh and Borden to burn the evidence of the crime. It may very well be that her association with Pugh led her into this crime which she might otherwise have not committed. However, that fact does not require a finding that she was a minimal participant. In light of the facts before the district court, we conclude that it did not clearly err in declining to apply the "minimal participant" sentencing reduction.

2. Borden

Borden broadly contends that his sentence is "extremely harsh compared to the actual crime that was committed" and, thus, substantively unreasonable under 18 U.S.C. § 3553(a). Borden has failed to articulate which—if any—of the §3553(a) factors would demonstrate the unreasonableness of his sentence. When a sentence falls within a properly calculated guidelines range, the sentence is presumptively reasonable. *See United States v. Medina-Argueta*, 454 F.3d 479, 481 (5th Cir. 2006). Borden's life sentence fell within the properly calculated range for his convictions. He has offered nothing but naked assertions of excess to rebut this presumption. Accordingly, we find the district court did not abuse its discretion in imposing Borden's sentence—particularly in light of the significant evidence presented to the district court regarding Borden's personal culpability for a very serious and violent crime.

## III. CONCLUSION

For the reasons set forth above, the judgment of the district court is AFFIRMED.