

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

## NUMBER 13-09-00073-CR

**RUBEN STEVE RAMIREZ,**                                              **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                              **Appellee.**

**On appeal from the 2nd 25th District Court**
**of Gonzales County, Texas.**

## NUMBER 13-09-00135-CR

**BETTIE RUTH RAMIREZ,**                                              **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                              **Appellee.**

**On appeal from the 2nd 25th District Court**
**of Gonzales County, Texas.**

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Yañez and Garza**
**Memorandum Opinion by Justice Garza**

Appellants, Ruben Steve Ramirez and Bettie Ruth Ramirez, were tried concurrently for the murder of their granddaughter C.R., and serious bodily injury to their granddaughter K.R.[1] The jury convicted Steve of murder and serious bodily injury to a child, each a first-degree felony. *See* TEX. PENAL CODE ANN. § 19.02 (Vernon 2003), § 22.04(a)(1) (Vernon 2005). Steve was sentenced to life in prison for the murder charge, and ninety-nine years for the serious bodily injury to a child charge.[2] *See id*. § 12.32 (Vernon Supp. 2009). The jury convicted Bettie of murder, serious bodily injury to a child, and injury to a child. *See id*. §§ 19.02, 22.04(a)(1), (a)(3). She was sentenced to life in prison for the murder charge, ninety-nine years in prison for the serious bodily injury to a child charge, and ten years in prison for the injury to a child charge.[3] *See id*. § 12.32. By one issue, with five sub-issues, both Steve and Bettie contend that their respective trial attorneys rendered ineffective legal assistance. We affirm.

## I. BACKGROUND

The record reflects that Steve and Bettie legally adopted their biological grandchildren, C.R. and K.R., in 1999. Evidence adduced at trial established that on

---

[1] To protect the privacy of the minor children in this case, we refer to them by their initials. *See* TEX. R. APP. P. 9.8.

[2] Steve was also fined $10,000 for the murder conviction and $10,000 for the serious bodily injury to a child conviction, for a total of $20,000. His sentences were ordered to run concurrently.

[3] Bettie was also fined $10,000 for her murder conviction, $10,000 for the serious bodily injury to a child conviction, and $10,000 for the injury to a child conviction, for a total of $30,000. Her sentences were ordered to run concurrently.

August 23, 2007, the Ramirezes drove eight-year-old C.R. to a local fire department in Gonzales County, Texas after she allegedly stopped breathing. Belmont Volunteer Fire Department official Kenneth Schauer testified that C.R. appeared to be dead on arrival. Schauer testified that C.R. was "cool to the touch" and severely emaciated, wearing only a diaper and a T-shirt. He also noted that C.R. had circumferential scars and bruises around her wrists and ankles. C.R. was later declared dead by Gonzales County EMS officials.

The record shows that Child Protective Services investigated the Ramirezes in 2004, after school officials reported that the girls were stealing food from classmates and from trash cans. The Ramirezes, apparently upset about the investigation, subsequently withdrew C.R. and K.R. from school to home-school them. The girls' isolation from school and society proved harmful and, in C.R.'s case, deadly. Various law enforcement and medical personnel testified at trial that, upon investigating C.R.'s death, they discovered that C.R. and her sister K.R. had been systematically starved and abused by their grandparents. C.R.'s autopsy revealed severe starvation and multi-organ failure; blunt force trauma injuries to her head; ligature marks at her hands and wrists; scars at her waist; sores, bruises, and abrasions all over her body; a broken and bruised right big toenail; and decubitus ulcers on her back and buttocks. K.R., C.R.'s eleven-year-old surviving sister, had similar injuries. She explained at trial that C.R.'s head injuries were caused when Steve hit C.R. on the head with his cane, and the toenail injuries were caused when Bettie hit C.R.'s foot with a broken shovel handle. K.R. also explained that she and her sister were regularly hit with hammers, sticks, belts, and the leg of a green plastic chair. K.R. testified that her grandparents routinely withheld food and water from

3

the girls, and that the longest she went without eating was one week.  K.R. also testified that C.R. had been critically ill for several days prior to her death, and that her grandparents had repeatedly hit C.R. on her legs while she lay sick in bed.

Jeremy Belin, a sergeant with the Gonzales County Sheriff's Department, testified that through his investigation of C.R.'s death, he learned that the girls lived in a room where the windows were covered.  He reported that the door to the bedroom they shared had been cut off on top, and a pet gate had been installed in its place.   Cowbells hung from both the doorknob and the pet gate; K.R. testified that the girls would get in trouble if a bell rang at night.  C.R. slept on a lawnchair which was covered with thin padding and dirty linens, and K.R. slept on the floor or on another lawnchair.  K.R. also testified that she and her sister were often tied to their lawnchairs or other bedroom furniture at night, which explained the ligature marks around both girls' wrists and ankles.[4]  She testified that her grandparents also placed bicycle chain locks around their waists at night, which accounted for the scars on their waists.  According to K.R., C.R., age eight, and K.R., age ten at the time, were forced to wear diapers at night so that their grandparents did not have to take them to the restroom.

Steve and Bettie each had their own defense attorney during trial, but the record demonstrates that the attorneys often worked together on various discovery, pre-trial, and trial issues. In their defense, Steve's and Bettie's attorneys presented evidence which demonstrated that they both suffered from obsessive/compulsive disorder, which manifested itself through hoarding.  Pictures taken by the Gonzales County Sheriff's Department corroborated this assertion, as they demonstrated that the house was filthy,

---

[4] The evidence showed that the girls were tied with monofilament packing tape or baling twine.

dusty, and stuffed with trash and rotting food items. Steve's and Bettie's attorneys also presented evidence that C.R. had suffered from diarrhea prior to her death, and that she injured herself playing on the trampoline.

The jury found both Steve and Bettie guilty of murder and serious bodily injury to a child. Bettie was also convicted of a separate injury to a child offense. These appeals followed.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Steve and Bettie argue that their respective trial counsels' representation was deficient for five reasons: (1) at voir dire, counsel failed to timely present a "Request for Jury Questionnaires" or obtain a ruling on the same, did not object to the time limit imposed by the trial judge, and did not question potential jurors on the issue of punishment; (2) counsel did not object to certain hearsay statements; (3) counsel failed to present a defensive theory by failing to make an opening statement or to fully develop defense expert testimony, and by bringing ineffective defense witnesses; (4) counsel did not object to the admission of evidence regarding prior crimes, wrongs, or bad acts; and (5) counsel's closing argument was prejudicial.

### A. Standard of Review and Applicable Law

The United States Supreme Court set forth a two-part test in *Strickland v. Washington* to determine whether a criminal defendant was provided ineffective assistance of counsel. *See Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). The *Strickland* test first requires the appellant to demonstrate that counsel's performance was so deficient that it fell below an

5

objective standard of reasonableness.  *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999); *see Strickland*, 466 U.S. at 687.  Assuming the appellant has demonstrated deficient assistance, he or she must then show that there is a reasonable probability that the final result would have been different but for counsel's errors.  *Thompson*, 9 S.W.3d at 812-13.

The appellant must prove ineffective assistance of counsel by a preponderance of the evidence.  *Id*.  The appellant must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance and that counsel's actions could be considered a sound trial strategy.  *Jaynes v. State*, 216 S.W.3d 839, 851 (Tex. App.–Corpus Christi 2006, no pet.).  A reviewing court should not second-guess legitimate tactical decisions made by trial counsel.  *State v. Morales*, 253 S.W.3d 686, 696 (Tex. Crim. App. 2008).  "When handed the task of determining the validity of a defendant's claim of ineffective assistance of counsel, any judicial review must be highly deferential to trial counsel and avoid the deleterious effects of hindsight."  *Thompson*, 9 S.W.3d at 813 (citing *Ingham v. State*, 679 S.W.2d 503, 509 (Tex. Crim. App. 1984)).  In determining whether an attorney's performance was deficient, we apply a strong presumption that the attorney's conduct was within the wide range of reasonable professional assistance.  *Id*. at 813**.**  We review the effectiveness of counsel in light of the totality of the representation and the circumstances of each case. *Id*.  The court of criminal appeals has made clear that, in most cases, a silent record providing no explanation for counsel's actions will not overcome the strong presumption of reasonable assistance.  *See Rylander v. State*, 101 S.W.3d 107, 110-11 (Tex. Crim. App. 2003).

**B.     Analysis**

**1.     Voir Dire Issues**

Steve and Bettie have three complaints with respect to their attorneys' performance during jury selection regarding their failure to: (1) timely present the jury questionnaire; (2) properly object to the time limits imposed by the judge; and (3) conduct proper voir dire on the punishment range.

**a.     Jury Questionnaire**

First, Steve and Bettie assert that their attorneys failed to timely present and obtain a ruling on their joint request for jury questionnaires, which fell below an acceptable standard of representation. The evidence shows that Steve and Bettie's attorneys jointly filed a "Request for Jury Questionnaire" on January 28, 2009.[5]  The trial court, despite appellants' claims otherwise, did in fact rule on this issue. On the first day of trial, the court expressly denied the request and noted that, even though the request was not timely presented during pre-trial proceedings, the court still reviewed the questionnaire and "[saw] no need for it."

The proposed jury questionnaire had questions regarding jurors' basic background information, such as their names, addresses, employment history, hobbies, previous juror experience, and political preferences. The questionnaire also had questions regarding the topic of child abuse. For example, it inquired whether potential jurors agreed, agreed strongly, or disagreed strongly with questions such as, "[r]egardless of what the law says,

---

[5]    Ruben also complains that his counsel did not file a bill of exception to preserve the jury questionnaire for appeal. We note that a party must file a formal bill of exception to appeal a matter that would not otherwise appear in the record. TEX. R. APP. P. 33.2. However, the proposed questionnaire was attached to the Request for Jury Questionnaire jointly filed by appellants' trial counsel. Thus, the questionnaire was in the record for our review, rendering this issue moot. *See In Re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 737 (Tex. 2005) (orig. proceeding).

a person who is charged with child abuse and murder should have to prove his innocence," and "[i]f the prosecution brings a parent to trial on charges of child abuse and murder, the parent is probably guilty." Our review of the voir dire record reveals that all of the potential jurors completed a juror information card, which covered many background questions asked in the questionnaire. In addition, the State and counsel for both Steve and Bettie each asked questions related to the topics covered in the questionnaire during jury selection. For instance, counsel asked whether jurors would believe children over adults in the cases of alleged child abuse, how jurors felt about parents who withheld food as punishment, and other similar issues addressed in the questionnaire.

The Texas Court of Criminal Appeals has held that "while a questionnaire may serve as an efficient vehicle for collecting demographic data, it is not the most reliable way to collect other types of information." *Gonzales v. State*, 3 S.W.3d 915, 917 (Tex. Crim. App. 1999). Here, demographic data was collected on juror information cards, and all of the attorneys asked detailed questions related to the questionnaire's topics. In light of the foregoing, we cannot conclude that Steve's and Bettie's trial counsel's performance regarding the jury questionnaire was deficient or prejudicial. *Thompson*, 9 S.W.3d at 812-13.

### b. Time Limit During Voir Dire

Second, Steve argues that his counsel should have objected to the trial court's one-hour limitation of questioning during voir dire.[6] We note that a trial court may impose

---

[6] Bettie's lawyer did object to the time limitations. Bettie's lawyer stated that:

This is—this is a case that involves a lot of people in the County. It provides—it has psychological evidence that's going to be intensive, that this—the Jury is going to have to consider. The medical testimony is going to be intensive that the Jury is going to have to consider, over and above the general qualification of a juror. In my estimation, an hour would

8

reasonable restrictions during voir dire examination. *Ratliff v. State*, 690 S.W.2d 597, 599 (Tex. Crim. App. 1985). These restrictions, however, must be balanced with the right of counsel to question prospective jurors to intelligently and effectively exercise peremptory challenges and challenges for cause. *McCarter v. State*, 837 S.W.2d 117, 119 (Tex. Crim. App. 1992).

In support of his argument that his counsel should have objected to the time limit, Steve relies on *Montez v. State*, 824 S.W.2d 308, 310 (Tex. App.–San Antonio 1992, no writ). In *Montez*, a jury convicted the defendant of aggravated possession of cocaine and sentenced him to twenty-five years' imprisonment. *Id*. at 308. The *Montez* court noted that the trial court "abbreviated the voir dire examination after appellant's trial counsel had individually examined only twenty-two members of the jury panel." *Id.* at 310. However, *Montez* is distinguishable because, here, the trial court allowed each attorney a full hour to question potential jurors, for a combined total of three hours for jury selection.[7] All of the attorneys were able to rely upon the juror information cards and the questioning by the other attorneys to determine which jurors would be suitable for selection.[8] The record even reflects that Steve's attorney did not use all of his allotted time—perhaps because all of his

---

be insufficient to [sic] time to pick a jury in this case. I want to note my objection to that.

The trial court noted that Bettie's lawyer "made [his] record," but did not formally overrule the objection. By not pursuing his objection to an adverse ruling, Bettie's lawyer waived this issue. *See* TEX. R. APP. P. 33.1(a)(2).

[7] The *Montez* court also found that, in addition to failing to object to the abbreviated time limit during jury selection, there was a "litany" of other professional errors made during the trial. *Montez v. State*, 824 S.W.2d 308, 310-11 (Tex. App.–San Antonio 1992, no writ). The court in *Montez* found that, "based on the totality of the circumstances, [their] confidence in the outcome [was] sufficiently undermined to require a remand for a new trial." *Id*. at 311. We do not find the same circumstances here.

[8] Bettie's counsel recognized this point. Prior to conducting voir dire, he stated, "Hopefully, [voir dire] will be short because some of the things the State talked about, I don't have to talk about, okay? And same thing for me. Some of the things I talk about, [Bettie's counsel] won't have to talk about."

9

questions had already been asked, or because the attorneys had interviewed enough potential jurors to comprise the twelve-person jury.[9]  Based on the record before us, we cannot say that Steve's attorney's failure to object to the time limit during jury selection would have resulted in a different outcome.  *Thompson*, 9 S.W.3d at 812-13.

### c.      Voir Dire on Punishment Range

Third, Steve and Bettie contend that their trial counsel's failure to conduct a voir dire examination on punishment prejudiced their respective cases.  The record shows, however, that the State questioned jurors about their opinions on punishment and probation during its voir dire examination.  The State asked the jury panel if they could consider the "full range of punishment in a murder case."  In fact, the State's prosecutor specifically stated that "that means that each of you could consider probation if a person . . . applied for probation."  Steve's and Bettie's counsel each had the right to rely on the State's questioning. *White v. State*, 999 S.W.2d 895, 898 (Tex. App.–Amarillo 1999, pet. ref'd) ("The State addressed the venire about the full range of punishment, which included an explanation of probation . . . [t]he topic having been broached and explored by others, defense counsel need not traverse those territories to be effective."); *see also Alcaraz v. State*, No. 05-02-00206-CR, 2003 Tex. App. LEXIS 2277, at **6-7 (Tex. App.–Dallas Mar. 17, 2003 no pet.) (mem. op., not designated for publication) (same).  We also note that there may be other reasons why Steve's and Bettie's attorneys refrained from this line of questioning:

> Counsel might have been afraid that more punishment-oriented jurors could influence other jurors; [they] may have been satisfied with the composition

_____
[9] Prior to voir dire, Steve's attorney stated, "There's not a whole bunch I can go over that hasn't already  been talked about, so I'm not going to try to keep you here all day."

10

of the panel; [they] may have refrained from asking questions about probation to avoid giving the State more information on which to exercise peremptory challenges; [they] may have believed that such questioning would be perceived as admitting there was credible evidence of guilt . . . Counsel might also have believed that the facts . . . were so severe that there was little or no possibility of appellant receiving probation upon conviction.

*Goodspeed v. State*, 187 S.W.3d 390, 393-94 (Tex. Crim. App. 2005). Accordingly, we cannot say that the failure to question the jury panel about punishment was deficient, as it could have been a part of Steve's and Bettie's counsels' trial strategy. *Jaynes*, 216 S.W.3d at 851.

**2.      Hearsay**

Steve and Bettie also complain that each of their attorneys rendered ineffective assistance when certain hearsay statements were admitted without objection. Evidence is hearsay if it is an out-of-court statement used to prove the truth of the matter asserted. TEX. R. EVID. 801(d). Hearsay is inadmissible unless it meets an exception to the hearsay rule. *Id*. at R. 802. A party must make a timely and specific objection to hearsay to preserve a complaint for appellate review. TEX. R. APP. P. 52(a); *Butler v. State*, 872 S.W.2d 227, 237 (Tex. Crim. App. 1994).

The first statements that Steve and Bettie complained of were elicited from Kimberly Richter of the Texas Department of Family Protective Services:

| [Prosecutor]: | On September 21, 2004, were you employed by Child Protective Services? |
| --- | --- |
| [Richter]: | Yes, ma'am, I was. |
| Q: | And at that time, did you do an investigation into the Ramirez family? |

11

A:          Yes, I did.

Q:          And what prompted the investigation?

A:          Our agency had received an intake with allegations of physical abuse to [K.R.] by her [grand]mother, Bettie Ramirez.

Q:          And do you know who made that report?

A:          I believe it was the school personnel.

Q:          And when you began that investigation, what type of behavior did you become aware of that the girls were doing at school?

A:          I had been told that [C.R.] was stealing food from other children, that she was eating—they were eating food on the playgrounds, out of trash cans. I also was told that both girls were making allegations that they were being spanked at home.

Q:          And that was in September of 2004; is that correct?

A:          That is correct.

Q:          And did you interview the children at that time?

A:          Yes, ma'am, I did.

. . . .

Q:          Did they have any concerns about their treatment at home?

A:          Both girls told me that they were spanked by their [grand]mother and [grand]father.

Q:          Did they indicate where they were spanked?

A:          I recall [C.R.] saying that she was spanked on the butt. [K.R.] told me that [C.R.]—she had seen her [grand]mother slap [C.R.] in the face.

12

Q:      Did they indicate if a belt had been used?

A:      Yes, they did.

Q:      So when you spoke with the witnesses at school, were there any witnesses to the kids eating out of the trash cans?

A:      Yes, there were, there were school personnel that had seen the children eat food out of trash cans.

Steve and Bettie also argued that the following exchange between the prosecutor and Texas Ranger Dewayne Goll, who primarily led the investigation following C.R.'s death, should have been objected to:

[Prosecutor]:   And the medical examiner in this case is Dr. Dolinak; is that right?

[Ranger Goll]:  Dr. David Dolinak, yes, ma'am.

        . . . .

Q:      Did he have any questions for you when you went and were present during the autopsy?

A:      I—I don't remember the specific questions that he had, but I do recall one term that he used that—that we spoke about because I was inquisitive because of what I do.

Q:      And that term is?

A:      Inanition.

Q:      Spell that, please.

A:      I knew you'd do that.  I-N-A-N-I-T-I-O-N.

Q:      And you asked about that term, why?

A:      I asked about that term, because, obviously, I had never heard it before, and he—he basically described

13

it to me. And, in fact, he wrote it on the dry erase board . . . and then he verbally told me what it was.

Q:        Which it was?

A:        He told me it's common in elderly people with dementia. They—they quite literally forget to eat and they will waste away, meaning their organs will actually be eaten by the body. It's kind of nasty sounding, but it's the way he described it.

Q:        And did he use that term "inanition" in regards to [C.R.]?

A:        Yes, he did.

. . . .

Q:        And after you had done the investigation with the autopsy, did you also speak with Dr. Nancy Kellogg?

A:        I did.

Q:        And why did you want to speak with Doctor Kellogg?

A:        I wanted to speak with her because I was aware that . . . she's a foreknown (sic) expert on child abuse and neglect cases . . . And I wanted to spend more time speaking with her because I was aware that she was speaking with [K.R.], the surviving girl . . . .

. . . .

Q:        And you said injuries to the toes, why is that significant?

A:        Because she had a big black bruise on—on her toes. And as I spoke with—Dr. Kellogg and—on the phone, she explained to me and how that happened.

Q:        And that was what?

A:        From a—a broken shovel handle jabbed into their feet.

Q: And you learned that from Doctor Kellogg?

A: That's correct.

Q: And do you know where she learned that information?

A: Absolutely. From [K.R.], the interview with [K.R.].

Steve and Bettie further complained that testimony from Gary Hopper, a former CPS investigator and Ashley Wynne, a second-grade teacher at the girls' former school, also elicited inappropriate hearsay testimony regarding the school investigation.[10]

We note that the failure to object to admissible evidence does not constitute ineffective assistance of counsel. *McFarland v. State*, 845 S.W.2d 824, 846 (Tex. Crim. App. 1992). Furthermore, failure to object to cumulative evidence is harmless and will not support a claim of ineffective assistance of counsel, either. *Darby v. State*, 922 S.W.2d 614, 623-24 (Tex. App.–Fort Worth 1996, pet. ref'd). To prove ineffective assistance, Steve and Bettie each had to prove that a different outcome would have resulted if the hearsay statements had been objected to and excluded. *Thompson*, 9 S.W.3d at 812-13. Based on the record before us, however, all of the unobjected-to testimony was cumulative of other testimony given at trial. K.R. herself testified, without objection, about the incidents at school when she and her sister would steal food from other students or would forage in school trash bins for food; she also confirmed that she and her sister's toes were injured when Steve or Bettie would hit their feet with a broken shovel handle. It is entirely plausible that Steve's and Bettie's attorneys knew that this testimony would be elicited from

---

[10] Bettie separately complains that her attorney erred when the State passed the witness Wynne and her counsel replied, "Oh, I'm sorry your Honor. Nodding off. No further questions." We find this argument to be without merit, as a review of the record reveals that Bettie's counsel's reference to "nodding off" was just a figure of speech, not an actual admission that he was falling asleep.

15

K.R., and that their strategy was to inoculate the jury from this evidence by having the jury first hear it from an adult rather than hear it first from the mouth of the young victim. In addition, C.R.'s autopsy report, previously admitted into evidence, already revealed that her body was so malnourished at the time of her death that it had begun metabolizing her muscles and organs, resulting in multi-organ failure. Accordingly, because the unobjected-to hearsay testimony was cumulative of other evidence, its admission cannot support appellants' claim of ineffective legal assistance. *Darby*, 922 S.W.2d at 623-24.

### 3.     Failure to Present a Defensive Theory

### a.     No Opening Statement

The Ramirezes claim that their attorneys' decision to waive opening statements "waive[ed] any opportunity to insert reasonable doubt into the State's case . . . ." They also contend that the "prevailing norm is to use opening statement to present defensive or alternative theories and mitigating evidence to the jury." However, because an opening statement can give the State a clear preview of the defense's strategy, Steve's and Bettie's attorneys may have deliberately avoided this step. *See Standerford v. State*, 928 S.W.2d 688, 697 (Tex. App.–Fort Worth, no pet.). The decision to deliver an opening statement is entirely optional. *See Calderon v. State*, 950 S.W.2d 121, 127 (Tex. App.–El Paso 1997, no pet.); *see also* TEX. CODE CRIM. PROC. ANN. art. 36.01(b) (Vernon 2007). Waiving an opening statement is a "tactical decision, and no ineffectiveness can be shown by this instance." *Standerford*, 928 S.W.2d at 697; *see also Gomez v. State*, No. 13-03-625-CR, 2005 Tex. App. LEXIS 3008, at *3 (Tex. App.–Corpus Christi Apr. 25, 2005, pet. denied) (mem. op., not designated for publication).

**b.      Failure to Develop Defense Expert Testimony**

Steve and Bettie also argue that their attorneys failed to develop defense expert testimony.  We disagree.  The record shows that the Ramirezes presented Jerome Davis Brown, Ph.D., as a defense expert witness on the issue of obsessive compulsive disorders, specifically with regard to the issue of hoarding.  Dr. Brown testified that he is a clinical psychologist with a bachelors' degree from Rice University, and masters' and doctoral degrees from the University of Houston.  He explained that his experience includes an internship at the Houston Veterans' Administration Medical Center, the Department of Psychiatry at Baylor College of Medicine in Houston, and the Harris County Forensic Psychiatry Unit.

Dr. Brown explained that both Steve and Bettie suffered from hoarding.  He explained that "hoarding is considered a subtype or subset of a major mental disorder called obsessive/compulsive disorder, or OCD."  Dr. Brown testified that although a person who suffers from hoarding syndrome typically does not pose a threat to others, a possible threat would manifest itself "on the order of neglect, or indifference, or not paying attention, or not doing what a regular person might do because they don't see it as dangerous or as a problem."  Dr. Brown also testified about the work of Dr. C.C. Brook regarding the issue of false statements of children in courtroom settings.  He explained  that "certain types of leading questions could influence children to change their memory of events" and that "children, being who they are, will often accommodate" interviewers who ask biased, leading questions.

When considering a complaint of ineffective assistance of counsel, we must indulge

17

the strong presumption that the trial attorney's conduct was within a wide range of reasonable representation. *Strickland*, 466 U.S. at 689. Here, Steve's and Bettie's attorneys presented a qualified witness who testified to the defendants' mental disorders and also cast a possible shadow on the reliability of K.R.'s testimony. We thus find the argument that Steve's and Bettie's attorney's failed to develop defense expert testimony to be without merit. *See Thompson*, 9 S.W.3d at 812-13.

### c. Other Defense Witnesses

Steve and Bettie also complain that their attorneys presented ineffective defense witnesses to testify on their behalf. Specifically, they allege that Mildred Evelyn Newman, Bettie's sister, and Arthur Newman, Bettie's brother-in-law, were harmful witnesses to their defense. Again, we disagree. Mildred testified that C.R. and K.R. enjoyed family dinners, outings, and holidays; regularly played outside; and loved to read. She also mentioned that the girls recently showed animals that they had raised at a local livestock show. Importantly, she testified that C.R. had diarrhea immediately before her death, thus establishing another possible explanation for C.R.'s demise. Arthur, despite alleging that K.R. "didn't love [Jesus] . . . she loved the devil," testified that he regularly saw the girls play outside and that he did not have any concerns about C.R. or K.R.'s health or safety. We review ineffective assistance of counsel by the totality of the representation, not by any isolated acts or omissions. *Jaynes*, 216 S.W.3d at 851. We are not persuaded by Steve's and Bettie's argument that their attorneys' performances were deficient or prejudicial when they presented Mildred and Arthur as defense witnesses. *See Thompson*, 9 S.W.3d at 812-13.

## 4. Evidence of Extraneous Acts

Evidence of past crimes, wrongs, or other bad acts is generally inadmissible under rule 404(b) of the Texas Rules of Evidence. TEX. R. EVID. 404(b). Steve and Bettie argue that their trial counsel's performance was deficient when they failed to object to the testimony from Richter, wherein she noted that CPS had once been called by school officials because K.R. and C.R. had been eating out of school trash cans. We note, though, that part of Steve and Bettie's defense strategy was that they suffered from obsessive/compulsive syndrome and, specifically, hoarding. It is reasonable to assume that the defense attorneys intentionally allowed this evidence to be admitted to show how the disorder manifested itself—by being neglectful or indifferent to K.R. and C.R.'s obvious physical and emotional needs, as Dr. Brown testified. Steve's and Bettie's attorneys also could have determined that the jury should know that Child Protective Services had already investigated the Ramirezes and closed their investigation, a fact to which Richter later testified. Either of these strategies would appear to fit within a "wide range of reasonable professional assistance," and we cannot say that there is a reasonable probability that, but for the admission of this evidence, the result would have been different. *Thompson*, 9 S.W.3d at 812-13.

## 5. Closing Arguments

Finally, Steve and Bettie complain that their counsels' closing arguments were deficient and prejudicial. Steve specifically cites the following:

> And some of you are asking, there is a question that I think exists in all of you, 'How can you represent somebody like Mr. Ramirez or Mrs. Ramirez? How do you do it?' Okay? Well, the way we do it is simply you look at the charge. We have the same set of laws that y'all are going to look at, and we

decide, do we have enough evidence to be convinced that this particular event has occurred? That's how you do it. You work through it. Try to stay emotionally detached from it. Doesn't work, but at least we have a road map where we can stay on target. And some of you are still mad at me asking that question, but why do I ask the question? Because it says here, you may consider all relevant facts and circumstances surrounding the killing, if any, of [C.R.], together with all relevant facts and circumstances going to show the conditions of the mind of the Defendant at the time of the offense alleged in the indictment.

This case involved the horrific death of C.R., who was killed by starvation and multiple forced injuries, and the severe abuse of her sister, K.R. Based on the record, it appears that Steve's attorney was attempting to persuade the jurors to work past their emotion and focus instead on considering "all relevant facts and circumstances surrounding the killing, if any, of [C.R.]." This appears to be sound trial strategy and within a range of reasonable professional representation. *See Strickland*, 466 U.S. at 689; *Jaynes*, 216 S.W.3d at 851.

Steve also complains about the following argument:

I know there are a lot of you people out there that were outraged at the decision in the O.J. Simpson trial. Y'all remember that? How in the world could that jury have found him not guilty? And my answer to you on that one is, we weren't in that jury room. We weren't on that panel. We didn't have the Charge that was given to us, and that jury had the conviction and the courage to work through and they determined that based upon the Charge and the evidence in the case, that the State had not proved beyond a reasonable doubt the elements necessary to convict Mr. Simpson, okay? That was a courageous decision, and they have to live with that the rest of their lives.

Counsel's reference to the O.J. Simpson trial was a pop culture reference to which many jurors could probably identify, and he likely used the reference to encourage jury members to make their decision based on the evidence and jury charge presented. Again, these references can be considered persuasive argument and trial strategy. *See*

20

*Strickland*, 466 U.S. at 689; *Jaynes*, 216 S.W.3d at 851. This neither proves deficiency or prejudice. *Thompson*, 9 S.W.3d at 812-13.

Bettie complains that, during closing argument, her counsel stated, "This is not a probation case. This is far more serious than a probation case. It's a case for confinement in the penitentiary. You just need to come up with the right number of years." Again, given the overwhelming nature of the evidence against both Steve and Bettie, the defense attorneys might have believed that there was little to no possibility of either defendant receiving probation, so instead they focused on minimizing the length of the sentence to be imposed. *See Goodspeed*, 187 S.W.3d at 393-94. In sum, neither defendant can show that their convictions would have been different but for these statements made during closing argument. *Thompson*, 9 S.W.3d at 812-13.

## III. CONCLUSION

Based on the foregoing, we overrule Steve and Bettie's issue on appeal; thus, we affirm the decisions of the trial court.

_____
DORI CONTRERAS GARZA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b)
Delivered and filed the
31st day of August, 2010.

_____

21